UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANTHONY GRANDISON, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )   Civil Action No. 08-00024 (RJL) |
| | ) |
| U.S. DEPARTMENT OF JUSTICE, | ) |
|   et al., | ) |
| | ) |
|     Defendants. | ) |
| | ) |

DEFENDANT CIVIL DIVISION'S OPPOSITION TO
"PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT" AND REPLY
IN FURTHER SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Preliminary Statement

Plaintiff commenced this action pro se on January 7, 2008, pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (2006), amended by OPEN Government Act of 2007, Pub. L. No. 110-175, 121 Stat. 2524, seeking the release of certain records pertaining to the civil case, Cheryl Ann Piechowicz, et al. v. United States, No. K-86-802 (D. Md. 1989) [hereinafter Piechowicz case], that might be maintained by the Civil Division and by the Executive Office for United States Attorneys (EOUSA), components of the United States Department of Justice.

On May 20, 2008, defendant Civil Division moved for summary judgment on the basis that no records were improperly withheld.[1] On June 17, 2008, plaintiff filed his "Cross Motion for Summary

---

[1] Defendant EOUSA has not yet filed a dispositive motion in this action.

-2-

Judgment."[2]  In that motion, plaintiff challenges defendant Civil
Division's decision to withhold records, in full and in part,
pursuant to Exemptions 6 and 7(C) of the FOIA, 5 U.S.C.
§ 552(b)(6), (b)(7)(C).  In accordance with Local Rule 7(d),
defendant Civil Division now files this opposition to plaintiff's
cross motion and reply in further support of defendant's motion
for summary judgment.

Based upon defendant Civil Division's motion for summary
judgment, filed May 20, 2008; the Declaration of James M.
Kovakas, Attorney-In-Charge of the Freedom of Information and
Privacy Acts (FOI/PA) Office, Civil Division, United States
Department of Justice [hereinafter Kovakas Declaration], filed
May 20, 2008; the accompanying supplemental declaration of James
M. Kovakas [hereinafter Second Kovakas Declaration]; Defendant
Civil Division's Counter-Statement of Material Facts; the entire
record herein; and for the reasons set forth below; defendant

---

[2] In addition, plaintiff served defendants with six
documents that have not yet been filed with the Court: (1)
"Plaintiff's Opposition to Defendants Summary Judgment Motion,"
(2) "Plaintiff's Statement of Material Facts as to Which There Is
No Genuine Issue, Pursuant to Local Rule 7(h)," (3) "Plaintiff's
Exhibit (A) (Grandison Declaration)," (4) "Plaintiff's Exhibit
(B) (Cheryl Ann Piechowicz's Deposition) (March 30, 1987
Deposition)," (5) "Plaintiff's Exhibit (C) (Former Assistant U.S.
Attorney, James C. Savage) (April 1, 1987 Deposition)," and (6)
"Plaintiff's Exhibit (D) (Letter of Janice Galli McLeod)
(Associate Director)."  By letter dated June 20, 2008, plaintiff
provided to defendant fourteen additional pages to supplement his
"Exhibit (C)."  Defendant has attached each of these documents as
exhibits to the instant memorandum.

-3-

Civil Division respectfully submits that plaintiff's arguments are entirely without merit and that defendant's motion for summary judgment should be granted pursuant to Rule 56 of the Federal Rules of Civil Procedure.

<u>Argument</u>

I.  The Civil Division Properly Determined that the Records at Issue Satisfy the Threshold of Exemption 6, 5 U.S.C. § 552(b)(6)

Plaintiff argues that the records withheld by the Civil Division do not satisfy the Exemption 6 threshold because some of the individuals mentioned therein are deceased.  (<u>See</u> Pl.'s Cross Mot. for Summ. J. at 4-5 [hereinafter Pl.'s Cross Mot.].) Plaintiff's argument confuses two separate issues, namely, whether the threshold of Exemption 6 is satisfied and whether the Civil Division conducted a reasonable inquiry to determine the life status of certain individuals.  Defendant will address both of these issues in turn.

The Civil Division appropriately determined that the requested records meet the threshold requirement of Exemption 6, which pertains to information that is contained in "personnel and medical files and similar files."  5 U.S.C. § 552(b)(6).  In this case, the requested records are neither personnel nor medical records, but qualify as "similar files."  (<u>See</u> Mem. of P. & A. in Support of Def. Civil Division's Mot. for Summ. J. at 6-8, filed May 20, 2008 [hereinafter Def.'s Mem.]; Kovakas Decl. ¶ 20.)

-4-

The Supreme Court has broadly construed the term "similar files" to include any records that contain personally-identifying information. See Dep't of State v. Wash. Post. Co., 456 U.S. 595, 601 (1982) (concluding that Congress did not intend "to limit Exemption 6 to a narrow class of files containing only a discrete kind of personal information . . .[r]ather '[the] exemption [was] intended to cover detailed Government records on an individual which can be identified as applying to that individual'" (quoting the legislative history)). Moreover, an agency is not required to demonstrate that the withheld information is intimate or embarrassing in nature. See Horowitz v. Peace Corps, 428 F.3d 271, 279 (D.C. Cir. 2005) (recognizing that "[e]ven seemingly innocuous information can be enough to trigger the protections of Exemption 6"). As such, courts have consistently found that Exemption 6 applies to a wide range of records that contain information that would identify a particular individual. See Dep't of State v. Ray, 502 U.S. 164, 173 (1991) (holding that reports containing government interviews of Haitian immigrants "unquestionably apply to particular individuals" and, accordingly, "are 'similar files' within the meaning of the exemption"); Multi AG Media LLC v. Dep't of Agriculture, 515 F.3d 1224, 1228-29 (D.C. Cir. 2008) (finding that records containing financial information that is easily traceable to individuals meet the Exemption 6 threshold).

-5-

In the instant case, the records responsive to plaintiff's
request contain information that would identify specific
individuals who were involved in some aspect of the Piechowicz
case, including law enforcement officers, witnesses and targets
of the underlying investigation of plaintiff.  (See Kovakas Decl.
¶¶ 18-21.)  Accordingly, these records clearly satisfy the
threshold requirement of Exemption 6.  See, e.g., Judicial Watch,
Inc. v. Dep't of Justice, 365 F.3d 1108, 1125 (D.C. Cir. 2004)
(concluding that petitions for pardons qualify for protection
under Exemption 6 because "[t]hese documents easily fall under
the purview of an individual's 'interest in avoiding the
disclosure of personal matters,' and controlling 'information
concerning his or her person'" (quoting Dep't of Justice v.
Reporters Comm. for Freedom of the Press, 489 U.S. 749, 762-63
(1989))).

    II.   The Civil Division Has Made a Reasonable Effort
          to Ascertain Whether Certain Individuals Are
          Alive or Deceased and Has Balanced the Relevant
          Privacy Interests and Public Interest Accordingly

Upon determining that the threshold requirements of
Exemptions 6 and 7(C) applied to the records in question, the
Civil Division then properly considered plaintiff's claims that
three individuals associated with the Piechowicz case are
deceased when it applied the relevant balancing tests.  (See
Pl.'s Cross Mot. at 11); Schrecker v. Dep't of Justice, 254 F.3d
162, 166 (D.C. Cir. 2001) (concluding that "the fact of

-6-

death, . . . while not requiring the release of information, is a
relevant factor to be taken into account in the balancing
decision whether to release information").

        In this case, the Civil Division made a reasonable effort to
ascertain whether Cheryl Ann Piechowicz, Joseph I. Kennedy, Jr.,
and John McCarthy, the three individuals named by plaintiff as
deceased, are alive or dead.  (See Second Kovakas Decl. ¶¶ 4-6.)
With respect to Cheryl Ann Piechowicz, the Civil Division as a
matter of administrative discretion conducted an Internet search
and located a press release noting her date of death, which the
Civil Division determined was sufficient proof that she is
deceased.  (See id. ¶ 4.)  In light of this finding, the Civil
Division balanced the privacy interests and public interests at
stake and concluded that certain responsive records contained
nonexempt information which was segregable and appropriate for
release.  (See Kovakas Decl. ¶¶ 15, 22; Second Kovakas Decl.
¶ 7.)

        With respect to Joseph I. Kennedy, Jr., the Civil Division
searched the Internet as well as the Social Security Death Index
by using his name as a search term.  (See Second Kovakas Decl.
¶ 5.)  However, the Civil Division found that the absence of any
additional, corroborating information, such as Kennedy's date of
birth, date of death or social security number, made it
impossible to verify whether any of the information that

-7-

identified a "Joseph Kennedy" referred to the individual in
question.  (See id.)

    Similarly, the Civil Division attempted, but was unable, to
substantiate plaintiff's claim that the court reporter who
transcribed a deposition in connection with the Piechowicz case
is alive or deceased.  (See id. ¶ 6.)  Moreover, hearsay, such as
the statement by the former owner of a court reporting company
that he had learned of McCarthy's death "through the grapevine,"
is not, in and of itself, adequate proof of death.  (See id.; see
also Kovakas Decl. ¶ 8 Ex. E.)

    Where the life status of an individual is in question,
courts have required that an agency make a reasonable effort to
determine whether the person is alive or dead.  See Schrecker v.
Dep't of Justice, 349 F.3d 657, 662 (D.C. Cir. 2003) ("[A] court
must assure itself that the Government has made a reasonable
effort to ascertain life status . . . [a]nd the Government's
efforts must be assessed in light of the accessibility of the
relevant information").  The reasonableness of those efforts is
evaluated on a case-by-case basis.  See Johnson v. EOUSA, 310
F.3d 771, 776 (D.C. Cir. 2002) (refusing to "establish a
brightline set of steps" for an agency to verify whether an
individual is alive or deceased).  Importantly, the government's
"failure to discover the information sought is not conclusive

-8-

evidence that the agency has failed to make a reasonable effort."
Schrecker, 349 F.3d at 662.

Without additional personally-identifying information about
Kennedy and McCarthy, the Civil Division could not conceive of
any other, reasonable methods by which to verify plaintiff's
claims that they are deceased.  (See Second Kovakas Decl.
¶¶ 5, 6.)  In light of the resources and information available to
the Civil Division, its efforts to ascertain the life status of
these individuals was altogether reasonable.  See e.g.,
Schrecker, 349 F.3d at 661-65 (holding that the FBI's search to
determine the life status of an individual was reasonable where
it checked Who Was Who, applied the 100-year rule, and searched
the Social Security Death Index, previous FOIA requests, and
internal sources).  Accordingly, the Civil Division properly
concluded that the release of any information about Kennedy,
McCarthy, as well as other third parties mentioned in the
responsive records "would constitute a clearly unwarranted
invasion of [their] personal privacy."  5 U.S.C. § 552(b)(6).

   III.  The Civil Division Correctly Identified
         the Privacy Interests of the Individuals
         Referenced in the Records at Issue

Plaintiff also takes issue with the Civil Division's
position that disclosure of information about third parties would
subject them to harassment.  (See Pl.'s Cross Mot. at 11.)
Plaintiff's argument on this point is easily dismissed.  As

-9-

previously discussed in its motion for summary judgment,
considering the impetus for the Piechowicz case which forms the
basis of this litigation, the Civil Division's concerns are
especially compelling.  (See Def.'s Mem. at 7-11, 17-21.)
Namely, plaintiff, from prison, arranged for the murder of two
people, one of whom was scheduled to testify at his trial. (See
Kovakas Decl. ¶¶ 19, 21.); see generally Grandison v. State, 670
A.2d 398 (D. Md. 1995) (outlining the facts of Grandison's
capital case).  Plaintiff, who has been sentenced to death for
his role in those murders, has nothing to lose from harassing
individuals associated with the Piechowicz case in an effort to
uncover information about, as the plaintiff suggests, "the real
person, or persons who were responsible for the murders."  (See
Pl.'s Cross Mot. at 15.)  This point is further bolstered by the
fact that plaintiff recently attempted to obtain the records at
issue in this FOIA case from the reporting company that
transcribed a deposition in the Piechowicz case.  (See Kovakas
Decl. ¶ 8 Ex. E.)  By withholding personally-identifying
information of third parties, the Civil Division has protected a
privacy interest that has been long-recognized by the Supreme
Court.  See DOD v. FLRA, 510 U.S. 487, 501 (1994) (permitting an
agency to withhold home addresses of government employees in
order to spare them from unwanted solicitation); Ray, 502 U.S. at
176-79 (holding that the agency properly withheld the names and

-10-

other identifying information of Haitian returnees due to the
risk of retaliatory action); (<u>see</u> <u>also</u> Def.'s Mem. at 7-11, 17-
21.)

        IV.  The Civil Division Properly Determined that
             the Records at Issue Satisfy the Threshold
             <u>of Exemption 7, 5 U.S.C. § 552(b)(7)</u>

     Plaintiff argues that the records at issue do not meet the
threshold requirement of Exemption 7, which pertains to "records
or information compiled for law enforcement purposes." 5 U.S.C.
§ 552(b)(7). Specifically, plaintiff asserts that those records
"were not created in conjunction with any federal or state
criminal investigation, or for any investigatory purposes by law
enforcement." (Pl.'s Cross Mot. at 8.) As sole support for this
assertion, plaintiff maintains that at the time the <u>Piechowicz</u>
case was initiated, he was already incarcerated and, accordingly,
any records created in connection with that lawsuit did not have
a law enforcement purpose. (<u>See</u> Pl.'s Cross Mot. at 7-9.)

     Plaintiff obviously misunderstands the Civil Division's
rationale for invoking Exemption 7. The Civil Division does not
contend that the requested records themselves were created for a
law enforcement purpose; rather, it determined that these
documents consist of law enforcement information that originally
appeared in other records that were, in fact, compiled for law
enforcement purposes. (<u>See</u> Def.'s Mot. at 14-17.) In <u>FBI v.</u>
<u>Abramson</u>, 456 U.S. 615, 630 (1982), the Supreme Court recognized
that the reasons for Exemption 7 "may well remain intact even

-11-

though information in a law enforcement record is recompiled in
another document for a non-law-enforcement function."
Consequently, the Court held that "information initially
contained in a record made for law enforcement purposes continues
to meet the threshold requirements of Exemption 7 where that
recorded information is reproduced or summarized in a new
document prepared for a non-law-enforcement purpose." Id. 631-
32. Thus, the Civil Division has met its burden to demonstrate
that the requested records meet the Exemption 7 threshold. (See
Def.'s Mem. at 14-17; Kovakas Decl. ¶¶ 16, 17.)

> V.    The Civil Division Properly Determined that
>        There Is No Qualifying Public Interest under
>        Exemptions 6 and 7(C), 5 U.S.C. § 552(b)(6),(7)

Plaintiff persists in raising the argument that his
allegations of prosecutorial misconduct constitute a qualifying
public interest that would override any corresponding privacy
interests of third parties and compels disclosure of the
requested records. (See Pl.'s Cross Mot. at 14-15.)
Specifically, plaintiff claims that state and federal prosecutors
altered the pre-trial transcripts related to his criminal case
and suborned perjury during his trial. (See id. at 15.) As an
initial matter, plaintiff's personal quest to challenge his
conviction does not constitute a "public interest" recognized
under the FOIA. See Reporters Comm., 489 U.S. at 762-63
(defining a "public interest" as one that reveals operations or
activities of the government). Furthermore, unsubstantiated

-12-

allegations of misconduct such as those presented by plaintiff
are not sufficient to overcome the weighty privacy interests
identified by the Civil Division.  See <u>NARA v. Favish</u>, 541 U.S.
157, 174 (2004) (holding that where a FOIA plaintiff asserts
public interest based upon the improper or negligent actions of
government agents, "the requester must produce evidence that
would warrant a belief by a reasonable person that the alleged
Government impropriety might have occurred"); (see <u>also</u> Def.'s
Mem. at 12-14, 20-21; Kovakas Decl. ¶¶ 18, 19, 21.)  Notably, the
Court of Appeals for the District of Columbia Circuit has
repeatedly refused to recognize that unsupported allegations of
government misconduct qualify as a valid public interest under
the FOIA.  See <u>Boyd v. Criminal Div. of the Dep't of Justice</u>, 475
F.3d 381, 388 (D.C. Cir. 2007) (finding that "[u]nsubstantiated
assertions of government wrongdoing . . . do not establish 'a
meaningful evidentiary showing'"); <u>Valdez v. Dep't of Justice</u>,
No. 07-5131, 2007 U.S. App. LEXIS 30192, at *2 (D.C. Cir.
Dec. 31, 2007) (holding that the appellant's unsupported
allegations of government misconduct "do not establish a
meaningful evidentiary showing that can overcome the presumption
of legitimacy accorded to the government's official conduct").
In any event, any allegations of misconduct in the <u>Piechowicz</u>
case pertain to law enforcement officials' failure to adequately
protect Cheryl Ann Piechowicz's family members from plaintiff.
Accordingly, the public interest that is asserted by plaintiff

-13-

would not be borne out by the requested records.

VI.  Public Statements by Individuals Involved
     in the Piechowicz Case Do Not Constitute
     Waiver of Their Privacy Interests

Plaintiff maintains that the parties involved in the Piechowicz case waived their privacy rights "once they testified in those public forums were [sic] the general public had an opportunity to see and hear them testify." (See Pl.'s Cross Mot. at 13.) Plaintiff is patently wrong. Plaintiff has not presented any evidence to suggest that these parties ever testified in open court or that the contents of their depositions and interrogatories were entered into evidence or were publicly available. Additionally, plaintiff asserts that a waiver was effectuated by the fact that the records in the Piechowicz case were not placed under seal. (See id. at 10, 13.) However, plaintiff cites no legal authority for this proposition and defendant is not aware of any.

VII.  Plaintiff Has Failed to Demonstrate that Any
      of the Withheld Records Are in the Public Domain

Plaintiff argues that the records in question are in the public domain and, therefore, must be disclosed. This argument fails, however, because plaintiff has not shown that the specific records that he requested were ever publicly available. See Assassination Archives & Research Ctr. v. CIA, 334 F.3d 55, 60 (D.C. Cir. 2003) (concluding that a FOIA plaintiff must show that the material sought duplicates an agency's prior disclosure); Davis v. Dep't of Justice, 968 F.2d 1276, 1282 (D.C. Cir. 1992)

-14-

(holding that while the ultimate burden of persuasion remains on the government, "a party who asserts that material is publicly available carries the burden of production on that issue").  In cases where FOIA plaintiffs have prevailed on waiver claims, they have demonstrated with specificity that duplicate information is publicly available.  See, e.g., Cottone v. Reno, 193 F.3d 550, 555 (D.C. Cir. 1999) (finding that the government waived its ability to assert Exemption 7(D) to withhold audiotapes where plaintiff was able to show precisely which conversations were aired in open court by referencing an official trial transcript).

Here, plaintiff has made an entirely unsupported contention that "the general public has been able to readily obtain this identical information for the last twenty years or more from the Clerk's Office of the United States District Court for the District of Maryland." (Pl.'s Cross Mot. at 16.)  He further claims that he received portions of depositions related to the Piechowicz case free of charge from the District Court. (See Exs. 3 at 2, 4, 5, 7.)[3]  Although the Piechowicz case was held before the United States District Court for the District of Maryland, plaintiff has not produced any evidence to show that any of the discovery materials requested by plaintiff from the Civil Division were ever filed in that case or with that Court. See Students Against Genocide v. Dep't of State, 257 F.3d 828, 836 (D.C. Cir. 2001) ("For the public domain doctrine to apply,

_____

[3] Plaintiff's exhibits, attached to the instant memorandum, are described in footnote 2.

-15-

the specific information sought must have already been 'disclosed and preserved in a permanent public record.'" quoting <u>Cottone</u>, 193 F.3d at 554)).  Indeed, plaintiff's persistent attempts to obtain this discovery material, such as his efforts to get copies of the depositions transcripts from the court reporting company, strongly indicate that these records are not, in fact, publicly available.  See <u>Reporters Comm.</u>, 489 U.S. at 764 (noting that if certain records "were 'freely available,' there would be no reason to invoke the FOIA to obtain access to the information they contain"); (<u>see also</u> Kovakas Decl. ¶ 6.)  Accordingly, plaintiff also has failed to show that complete copies of the documents he seeks exist in the public domain.  See <u>Cottone</u>, 193 F.3d at 555 (stating that before finding waiver, the court "must be confident that the information sought is truly public and that the requester receives no more than what is publicly available").

Moreover, assuming arguendo that the documents, which are over twenty-years old, were once in the public domain, these records would have become "practically obscure" as a result of the passage of time.  See <u>Reporters Comm.</u>, 489 U.S. at 762-63 (finding that individuals maintain a substantial privacy interest in information that was previously disclosed to the public, but has again become private with the passage of time).

-16-

### VIII.  Plaintiff's Miscellaneous Arguments Are without Legal Merit

In perhaps a last ditch effort, plaintiff contends that a letter sent by the Office of Information and Privacy (OIP) in response to his FOIA appeal from a decision made by EOUSA precludes the Civil Division from invoking Exemptions 6 and 7(C). (See Pl.'s Cross Mot. at 13-14 & Ex. 6.)  Plaintiff's supposition is a non-sequitur.  EOUSA and the Civil Division are independent components of the Department of Justice and they maintain separate systems of records.  Both components are named in this case because plaintiff sent two separate FOIA requests, one to EOUSA and one to the Civil Division, asking for the same records. In recognition of the fact that Cheryl Ann Piechowicz is deceased, OIP's remand negated EOUSA's ability to "refuse to confirm or deny" the existence of records generally pertaining to the civil case that she commenced.  However, OIP's action did not affect EOUSA's ability to withhold any responsive records pursuant to Exemptions 6 and 7(C), much less have any such impact on the Civil Division.

Similarly, plaintiff's argument that the affidavits of the court reporters who transcribed depositions taken in the Piechowicz case operate as "ipso facto waivers" with respect to their contents is absurd.  (Pl.'s Cross Mot. at 12-13.) Plaintiff misunderstands the import of these affidavits, which merely certify that the reporters observed and recorded the

-17-

statements of the parties to the lawsuit.  As such, the Civil

Division rightfully did not give this argument any credence.

<u>Conclusion</u>

For the foregoing reasons, and based upon the entire record

herein, defendant Civil Division respectfully submits that its

Motion for Summary Judgment should be granted and that

plaintiff's cross motion should be denied.

Respectfully submitted,


_____
JEFFREY A. TAYLOR
(DC Bar #498610)
United States Attorney


_____
RUDOLPH CONTRERAS
(DC Bar #434122)
Assistant United States Attorney


                                      /s/
                           _____
Dated:  July 15, 2008      CAROLINE A. SMITH
                           (DC Bar #501942)
                           Attorney-Advisor
                           Office of Information and Privacy
                           United States Department of Justice
                           1425 New York Ave., NW, Suite 11050
                           Washington, DC  20530-0001
                           (202) 514-8858

                           Attorneys for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANTHONY GRANDISON,            )
                              )
      Plaintiff,              )
                              )
      v.                      )    Civil Action No. 08-00024 (RJL)
                              )
U.S. DEPARTMENT OF JUSTICE,   )
  et al.,                     )
                              )
      Defendants.             )
_____)

<u>ORDER</u>

Upon consideration of defendant Civil Division's Motion for
Summary Judgment and plaintiff's Cross Motion for Summary
Judgment, of all papers filed with respect thereto, and of the
entire record herein, and it appearing to the Court that the
granting of defendant Civil Division's motion and the denial of
plaintiff's cross motion, pursuant to Rule 56 of the Federal
Rules of Civil Procedure, would be just and proper, it is by the
Court this _____ day of _____ 2008,

ORDERED that defendant Civil Division's Motion for Summary
Judgment be, and it hereby is, granted; and it is further

ORDERED that plaintiff's Cross Motion for Summary Judgment
be, and it hereby is, denied; and it is further

ORDERED that this action be, and it hereby is, dismissed.

_____
UNITED STATES DISTRICT JUDGE

-2-

Copies to:

Mr. Anthony Grandison                    Caroline A. Smith
DOC ID No. 172622                        Attorney-Advisor
Maryland Correctional                    Office of Information &
  Adjustment Center                      1425 New York Ave., NW,
401 East Madison Street                    Suite 11050
Baltimore, MD  21202                     Washington, DC  20530

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANTHONY GRANDISON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 08-00024 (RJL) |
| | ) |
| U.S. DEPARTMENT OF JUSTICE | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## SECOND DECLARATION OF JAMES M. KOVAKAS

I, James M. Kovakas, make the following declaration under penalty of perjury.

1. I am the Attorney-In-Charge of the Freedom of Information and Privacy Acts (FOI/PA) Office, Civil Division, Department of Justice. The FOI/PA Office responds to requests for records of the Civil Division, made under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (2006), amended by OPEN Government Act of 2007, Pub. L. No. 110-175, 121 Stat. 2524. Pursuant to Civil Division Directive No. 137-80, I am authorized to exercise the authority of the Assistant Attorney General, Civil Division, to process requests for records under 5 U.S.C. § 552.

2. In connection with the Civil Division's Motion for Summary Judgment, I submitted a declaration detailing the Civil Division's processing of plaintiff's FOIA request. In that declaration, I provided a chronology of the administrative processing of the request as well as the Civil Division's justification for withholding certain information.

3. The purpose of this declaration is to address one issue raised by plaintiff in his Cross Motion for Summary Judgment. In his Cross Motion for Summary Judgment, plaintiff has asserted that three individuals who are mentioned in the requested records are deceased and that

2

any information about them in the records must be released. The individuals named by plaintiff are: (1) Cheryl Ann Piechowicz, (2) Joseph I. Kennedy, Jr., (3) John McCarthy, the court reporter who transcribed a deposition for the civil case. Each of these individuals were involved in the civil case, Cheryl Ann Piechowicz, et. al. v. United States, Civil No. K-86-802 (D. Md. 1989), the records of which are the subject of this litigation. This declaration describes the steps that I have taken to determine whether these individuals are alive or deceased.

4. In order to determine the life status of Cheryl Ann Piechowicz, I conducted an Internet search on the search engine "Google," using her name as a search term. As a result of the search, I found a press release from the University of Maryland Medical Center which discusses a heart donation made by Cheryl Ann Piechowicz's family following her death on February 12, 1998.[1] As described in my previous declaration, based on this information, I determined that additional documents were appropriate for release. Accordingly, by letter dated April 29, 2008, I provided plaintiff with copies of non-exempt portions of Piechowicz's deposition transcript consisting of eighty-eight pages and a thirteen-page record containing her answers to interrogatories. Of the 101 pages that were released, eleven pages of records were released in full and ninety pages were released in part with withholdings made pursuant to Exemptions 6 and 7(C) to protect the privacy interests of other individuals.

5. In addition, I conducted an Internet search using the Google search engine to determine whether Piechowicz's father, Joseph I. Kennedy, Jr., is alive or deceased. Since plaintiff did not provide Kennedy's date of birth, date of death, or social security number, I could only use his

---

[1] This press release is available at http://www.umm.edu/news/releases/donate.html (last visited on July 8, 2008).

3

name as a search term. I searched using different combinations of his name, such as "Joseph I.
Kennedy, Jr." "Joseph I. Kennedy" and "Joseph Kennedy." However, this search did not yield any
relevant results[2]. I also searched using Kennedy's name in conjunction with "Piechowicz."
Although this search uncovered some information about Kennedy and the underlying civil case
that is the subject of this litigation, none of the search results indicated that Kennedy has died. In
addition, I searched a commercially available version of the Social Security Death Index[3] using
Kennedy's first and last names and his middle initial. That search yielded two matches with the
same name. Based on age, I was able to eliminate one individual who died at the age of 20 in
1999. With respect to the second match, the Index indicated that a person with the same name
died in 2006 at the age of 86. Plaintiff asserts that the Joseph I. Kennedy died in the early or mid-
1990s. I have determined that neither of these individuals is the Joseph Kennedy in question. I
also performed a search of the Index using Kennedy's first and last names without his middle
initial. This search yielded 785 matches. There was no way for me to verify whether any of those
individuals is, in fact, the Joseph Kennedy who is associated with <u>Piechowicz</u> case. I am unable
to conceive of any other, reasonable way of confirming Kennedy's life status. Accordingly, I have
determined that Exemptions 6 and 7(C) continue to apply to any information referencing Joseph I.
Kennedy, Jr.

    6. Plaintiff has also alleged that John McCarthy, a court reporter who transcribed a

---

[2] In fact, one search yielded over 198,000 "hits." Many of the search results identified the
late President John F. Kennedy's father.

[3] Rootsweb, a genealogy website, maintains a Social Security Death Index which is
searchable by an individual's first, middle and last name and social security number. The website
is available at http://ssdi.rootsweb.ancestry.com.

4

deposition in connection with the Piechowicz case, is deceased. In support of his claim, plaintiff

provided a letter, which is not notarized, from Abraham Weinapple, the former owner of a

transcription company for which McCarthy worked as an independent contractor. Weinapple

states that McCarthy died of a heart attack in the mid-1990s and that he "only learned of his death

through the grapevine." (See Decl. of James Kovakas, Ex. E.) I have concluded that this letter

does not serve as sufficient proof that John McCarthy is deceased. As a matter of policy, the Civil

Division does not accept hearsay as proof that an individual has died. Additionally, the Civil

Division does not have the capability to verify the life status of individuals who were, at best,

ancillary to the case and cannot be identified by any means other than by name. I conducted an

Internet search on Google using his name, but as with any common name, there is no way to

determine whether any of the individuals identified in my search results are the McCarthy in

question. Accordingly, I have determined that any information referring to John McCarthy should

be withheld pursuant to Exemptions 6 and 7(C).

7. As stated in my earlier declaration, upon verifying that one of the individuals named by

plaintiff was dead, I re-reviewed the responsive records page-by-page and line-by-line to identify

information exempt from disclosure. I then released all reasonably segregable portions of the

records to plaintiff.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this __10th__ day of July 2008.

*James M. Kovakas*

James M. Kovakas
Attorney-In-Charge
FOI/PA Office, Civil Division
Department of Justice

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANTHONY GRANDISON,                )
                                  )
        Plaintiff,                )
                                  )
        v.                        )    Civil Action No. 08-00024 (RJL)
                                  )
U.S. DEPARTMENT OF JUSTICE,       )
  et al.,                         )
                                  )
        Defendants.               )
_____  )


DEFENDANT CIVIL DIVISION'S COUNTER-STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1, defendant Civil Division submits the following counter-statement of material facts in response to "Plaintiff's Statement of Material Facts as to Which There is No Genuine Issue Pursuant to the Local Rule 7(h)" in his Cross Motion for Summary Judgment.[1]  Defendant Civil Division further notes that, having moved for summary judgment, it maintains that there is no material fact in dispute which would preclude entry of summary judgment.

1.  Defendant disputes paragraphs 1-2 because defendant has insufficient information to verify the correctness of plaintiff's assertions.  In addition, plaintiff's statements are not relevant to the resolution of this matter. (See Defendant Civil Division's Opposition to "Plaintiff's Cross Motion for Summary Judgement" and Reply in Further Support of Defendant's Motion for Summary

_____

[1] Plaintiff served defendant Civil Division with his statement of material facts, but did not file this document with the Court, which is attached herein as defendant's Exhibit 2.

-2-

Judgment at 13 [hereinafter Def.'s Opp'n & Reply].)

2.  Defendant disputes paragraphs 3-6 because defendant has insufficient information to verify the correctness of plaintiff's assertions.

3.  Defendant disputes paragraph 7 only to the extent of plaintiff's characterization of conversations between the referenced parties and the media.

4.  Defendant disputes paragraph 8 only to the extent of plaintiff's characterization of the opinion and its relevancy to the resolution of this case.

5.  Defendant disputes paragraph 9 because defendant has insufficient information to verify the correctness of plaintiff's assertion.  (See Def.'s Opp'n & Reply at 6-8; Second Kovakas Declaration ¶ 5.)

6.  Defendant disputes paragraphs 10-11 because plaintiff's assertions are not relevant to the resolution of the portion of this action involving defendant Civil Division.

7.  Defendant disputes paragraph 12 only to the extent plaintiff's assertions are contradicted by defendant Civil Division's Statement of Material Facts as to Which There Is No Genuine Issue, Pursuant to Local Rule 7(h), filed on May 20, 2008.

8.  Defendant disputes paragraph 13 because plaintiff's assertions are not relevant to the resolution of the portion of

-3-

this action involving defendant Civil Division.

9.  Defendant disputes paragraphs 14-15 only to the extent
plaintiff's assertions are contradicted by defendant Civil
Division's Statement of Material Facts as to Which There Is No
Genuine Issue, Pursuant to Local Rule 7(h), filed on May 20,
2008.

10.  Defendant disputes paragraphs 16-19 because plaintiff's
assertions are not relevant to the resolution of the portion of
this action involving defendant Civil Division.

11.  Defendant disputes paragraph 20 because plaintiff's
assertions are not relevant to the resolution of the portion of
this action involving defendant Civil Division.  (See Def.'s
Opp'n & Reply at 16.)

12.  Defendant disputes paragraphs 21-22 because plaintiff's
assertions are not relevant to the resolution of the portion of
this action involving defendant Civil Division.

13.  Defendant disputes paragraphs 23-33 only to the extent
plaintiff's assertions are contradicted by the Docket in this
action.

14.  Defendant disputes paragraph 34 only to the extent
plaintiff's assertions are contradicted by defendant Civil
Division's Statement of Material Facts as to Which There Is No
Genuine Issue, Pursuant to Local Rule 7(h), filed on May 20,
2008.

-4-

15.  Defendant disputes paragraphs 35-40 only to the extent plaintiff's assertions are contradicted by the Docket in this action.

Respectfully submitted,

_____
JEFFREY A. TAYLOR
(DC Bar #498610)
United States Attorney


_____
RUDOLPH CONTRERAS
(DC Bar #434122)
Assistant United States Attorney


                                   /s/
Dated:  July 15, 2008     _____
                          CAROLINE A. SMITH
                          (DC Bar #501942)
                          Attorney-Advisor
                          Office of Information and Privacy
                          United States Department of Justice
                          1425 New York Ave., NW, Suite 11050
                          Washington, DC  20530-0001
                          (202) 514-8858

                          Attorneys for Defendants

Exhibit 1

No. 08-00024 (D.D.C.)(RJL)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ANTHONY GRANDISON,                              *

      Plaintiffs

                              * CIVIL ACTION NO. 08-00024 (RJL)

    v.

                         *

U.S. Department of Justice, et al.,

      Defendants                              *

               **************************************

## PLAINTIFF'S OPPOSITION TO DEFENDANTS SUMMARY JUDGMENT MOTION:

        Comes now the plaintiff, Anthony Grandison proceeding pro se, and respectfully moves this Honorable Court in answer to the defendants motion for summary judgment to deny the defendants motion pursuant to the Federal Rules of Civil Procedures, Rule 56, and states as follows:

**I. Introduction:**

        In March 2007, the plaintiff Grandison filed two separate but identical Freedom of Information Act (FOIA) requests pursuant to 5 U.S.C. &552 and departmental regulations *28 CFR 16. 5. 5 (d) (1) (ii) (expedite processing)* with the U.S. Department of Justice, Executive Office United States Attorneys hereafter ("EOUSA"), and the Civil Division requesting copies of certain documents created in the civil case of *Cheryl Ann Piechowicz, et al. v. United States, Civil No. K-86-802.* Subsequently after granting expedited proceeding, the defendants representative, James M. Kovakas the "Attorney In Charge" of FOIA/PA Office, Civil Division on April 17, 2007 informed plaintiff as follows:

    *This letter is in response to your March 7, 2007 request, made pursuant to the Freedom of Information Act (FOIA), & 5 U.S.C. &552, for copies of certain documents pertaining*

1

to the case Cheryl Ann Piechowicz, et al V. United States, Civil No. K-86-802. Pursuant to your request, we conducted a search of the Civil Division's file of the above-referenced case and identified the documents which your requested. I reviewed the depositions of Cheryl Ann Piechowicz and James C. Savage as well as answer to interrogatories by John I. Kennedy, Jr., Cheryl Ann Piechowicz, and the United States. I determined that these documents identify and/or contain personal information about other witnesses from your drug trafficking case, court officials, experts, attorneys and law enforcement officials connect with that matter. I am withholding these documents to protect the identifies and information concerning these individuals pursuant to 5 U.S.C. &552 (b) (6) and (b) (7) (C).

In respect to the second FOIA/PA request to ("EOUSA"), Assistant Director Mr. William G. Stewart II the representative of defendants ("EOUSA") likewise on May 21, 2007 informed plaintiff its branch was withheld the documents pursuant to (b) (6) and (b) (7) (C). Hence as a result of those two decisions the plaintiff Grandison filed two timely separate administrative appeals ("April, 2007 and June, 2007") premised on the defendants' erroneously reliance's upon exemptions (b) (6) and (b) (7) (C) of 5 U.S.C. &552 to deny his request. The defendants nonetheless failed to reach a timely decision related to the March 7, 2007 first appeal from the Civil Division denial of disclosure of documents pertinent to Cheryl Ann Piechowicz et. al v. United States. Nonetheless with respect to plaintiff's second administrative appeal from the denial by the ("EOUSA") of documents pertinent to the civil case of Cheryl Ann Piechowicz et. al v. United States, the administrative appeal division Associate Director, Janice Galli McLeod on August 2, 2007 reversed the ("EOUSA") defendants decision that consequently ipso facto reversed the Civil Division's decision denying the very same documents. See Plaintiff Grandison's Exhibit (D) (McLeod's August 2, 2007 Decision). However after being informed that the records nolonger exist plaintiff commenced in November, 2007 this action pro se case arises pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. & 552, and the Privacy Act, 5 U.S.C. & 552a, (2006), amended by OPEN Government Act of 2007, Pub. L. No. 110-175, 121 Stat. 2524, seeking the release of any records pertaining to the civil case, Cheryl Ann Piechowicz, et. al v.

2

United States, No. K-86-802 (D. Md. 1989), maintained by the Defendants Civil Division and by the Executive Office for United States Attorneys (EOUSA), components of the United States Department of Justice processing of plaintiff's FOIA request.

II.

REASONS WHY THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED:

Argument:

Contrary To The Civil Division Defendants Assertions Summary Judgment For The Defendants Is Absolutely Not Proper And The Defendants Have In Fact Improperly Withheld Information From Plaintiff.

In accordance with the statutory requirements of the FOIA and the requirements of Vaughn v. Rosen, 484 F.2d 820, 827 (D.C. Cir. 1973), the defendants Civil Division's declaration does not contain a complete description of or justification for the information withheld under Exemptions 6 and 7 (C), 5 U.S.C. & 52 (b) (6), (b) (7) (C). Simply because the names of the persons, third parties personnel and medical files or similar files the defendants are attempting to shield under the provisions of Exemptions 6 and 7 claiming disclosure would constitute a clearly unwarranted invasion of personal privacy is without merit. This is so, because those very documents have already previously been disclosed to the general public in there identical form by former Assistant U.S. Attorney, James Savage, Cheryl Ann Piechowicz as well as their attorneys in 1987 and 1988. See Plaintiff Grandison's Exhibit (A) (Grandison's Decl.), Plaintiff Grandison Exhibit (B) (Cheryl Ann Piechowicz Partial Deposition Identifying The Names Of The Parties, Etc., The Defendants Seeks To Protect), Plaintiff Grandison's Exhibit (C) (James Savage Partial Deposition Testimony). Also see Piechowicz v. U.S., 685 F. Supp. 486, (D. Md. 1988) id. at 685 F. Supp. 488 FN6,7,8,9, and 10, at. 493 FN16, and at. 498 FN28.

3

Plaintiff's Response To Defendants Argument I.

Contrary To The Civil Division Defendants' Arguments They Have Improperly
Withheld Records Under The Guise Of Exemptions (b) (6) of 5 U.S.C. 552.

In the instant case, contrary to defendants exemption (b) (6) assertions, [1] the
requested records aren't personnel medical records nor constitute similar files in light of the
fact they were created for the sole purpose of a civil lawsuit. See Piechowicz v. U.S., 685 F.
Supp. 486, (D. Md. 1988) id. at 685 F. Supp. 488 FN6,7,8,9, and 10, pg. 493 FN16, and pg.
498 FN28. [2] Hence the records became readily available to the general public to read and
learn Cheryl Ann Piechowicz, et. al, claimed former Assistant U.S. Attorney, James
Savage, DEA agent, John Ryan (a.k.a. Jack Ryan), and the Government failed to protect
her husband and sister who were killed on April 28, 1983 by an individual allegedly hired by
the plaintiff in the instant case, Anthony Grandison. See Piechowicz v. United States, 885
F.2d 1207, 1209 (4th 1989) id. at 895 F.2d 1209-1210.

The defendants nonetheless asserts the responsive records maintained by
the Civil Division contain personally identifying information of multiple third parties, including
law enforcement officers, witnesses, and targets of the underlying criminal investigation of
plaintiff. According to the defendants, these records unquestionably qualify as "similar files,"
under the Supreme Court's broad interpretation of that term. Wash. Post Co, , 456 U.S. at
601. As a result according to the defendants the Civil Division identified and then balanced
the privacy and public interests at stake and properly concluded that the disclosure of
certain records and portions of certain other records "would constitute a clearly unwarranted

---

[1] Exemption 6, the exemption on its face, creates a presumption in favor of disclosure. Information that must
otherwise be produced under FOIA may be withheld under Exemption 6 only if the Government shows (i) that
the information is contained in personnel medical or "similar files" (ii) that disclosure of the information would
constitute an "invasion of personnel privacy," and (iii) that such invasion is clearly unwarranted. See 5 USC
&552 (b)(6).

[2] Case originally cited in the District Court as Cheryl Ann Piechowicz, et al v. United States, No. K-86-802 (D.
Md. 1986).

invasion of personal privacy." 5 U.S.C. & 552(b)(6). As a result the Civil Division argues information about third party "witnesses, law enforcement officials, other subjects of the investigation, court personnel, experts, and attorneys (who were) involved in the criminal law enforcement investigation as well as the related tort litigation, could reasonably be expected to subject them to "harassment, threats, and retaliation. *See Defendants Summary Judgment Argument On Page 7-8, And 9 Based On The Decl. Of Kovakas.*

Clearly these arguments coalesced with defendants' Kovakas attached declaration in support such a proposition ignores the undeniable fact that Savage and Piechowicz on April 28, 1988 both individually reveal the contexts of their deposition testimony to the general public through the news media when they gave exclusive interviews to reporter *(Kelly Gilbert)* of the Baltimore Evening Sun Newspaper providing the reporter with the identical answers given previously given as answers to interrogatories coalesced with identical testimony when they were deposed individually during their deposition testimony. **See Defendants Exhibit (G) Attached To Defendants Summary Judgment Motion, and Plaintiff's Exhibit (A) (Grandison's Decl).** Likewise the defendants' summary judgment arguments and Kovakas declaration fails to reveal that Ms. Janice Galli McLeod, the Associate Director of Administrative Appeal Division, the ("EOUSA") and McLeod's Staff August 2, 2007 decision reversing the initial decision of the ("EOUSA") denying disclosure constituted a decision that the files of <u>Cheryl Ann Piechowicz, et al v. United States</u> failed to meet the threshold requirements of either exemption b (6) or (b) (7) (C). **See Plaintiff Exhibit (D) (McLeod Decision Dated August 2, 2007).** Since that ruling had the effect of Ipso Facto reversing the April 17, 2007 Civil Division decision denying plaintiff's FOIA request despite the fact the Department of Justice maintains many branches.

Moreover the defendants' exemptions 6 and 7(C) arguments combined with Kovakas declaration fails to disclose to the Court that the identifies they seek to protect of the individual persons, court officials, law enforcement officers, and information have already been released to the general public domain. <u>Cheryl Ann Piechowicz, et al v. United</u>

States, 685 F.Supp. 486 (D. Md. 1988) Id. at 498 FN28. Also See Plaintiff Grandison's Exhibit (A) (Grandison's Decl.), Plaintiff Grandison's Exhibit (B) (Cheryl Ann Piechowicz Partial Deposition, and Plaintiff Grandison's Exhibit (C) (James Savage Partial Deposition Testimony).

### The Defendants' arguments and Kovakas Declaration failure ascertain,.

Although plaintiff's request had informed the Civil Division defendants that John I. Kennedy Jr. died from cancer in the late '90s. Defendants' summary judgment arguments as well as Kovakas Declaration fails to reveal what if any steps the defendants took to ascertain whether or not John I. Kennedy was dead or alive, the individual who gave answers to the defendants Savage and Ryan's interrogatories. Despite defendants knew Kennedy as a decease person had no surviving privacy interest that would legally justify the withholding of documents or other information relating to him. Cordell v. Detective Publication, Inc., 419 F.2d 989 (6th Cir. 1969), and Maritote v Desilu Productions, 345 F.2d 418 (7th Cir. 1965) *both standing for the proposition that the right to recovery for invasion of privacy is purely personal and "lapses with the death of the person who enjoyed it." Cordell, 419 F.2d at 990. It also has been alternatively recognized that the privacy interest in nondisclosure of identifying information may be diminished where the individual is deceased.* Schrecker II, 349 F.3d at 661. See Davis v. Dep't of Justice, 460 F.3d 92 (CA D.C. 2006) *at 95-97; "The fact of death, while not requiring the release of information is a relevant factor to be taken into account in the balancing decision whether to release information. Id. (quoting Schrecker I, 254 F.3d at 166). Consequently, without confirmation that the Government took certain basis steps to ascertain whether an individual was dead or alive, we are unable to say whether the Government reasonably balanced the interest in personal privacy against the public interest in release of the information at issue. "Schrecker I, 254 F.3d at 167. The Government obligation in this regard is to make a reasonable effort to ascertain life status. Schrecker II, 349 F.3d at 662. Its efforts must be assessed in light of the accessibility of the relevant information.* Davis v. Dep't of Justice, supra Id.

6

Kovakas declaration fails to articulate that the Civil Division defendants took certain basis steps to ascertain whether the individual John I. Kennedy was dead or alive. Hence the Civil Division defendants may not through its representative claim a privacy interest in behalf of Cheryl Piechowicz, her father Kennedy or any other decease persons who willingly waived any privacy interest by providing the very same identical information in a public forum in a civil litigation were the decease and the government gave depositions to third parties, filed interrogatories, answered interrogatories and willing publicly provided the very same identical information that revealed the identities to the general public they now seek to claim a privacy interest under exemption 6. Cheryl Ann Piechowicz, et al v. United States, 685 F.Supp. 486 (D. Md. 1988).

> On March 13, 1986, in this civil case, a twelve-count complaint was filed by surviving family members of the two victims, namely Cheryl Piechowicz, (FN6) Sherrie Marie Waldrup (Sherrie), (FN7) John I. Kennedy, Jr. (John) (FN8), and Melva Kennedy (Melva), (FN9) against the United States and also against Savage and Ryan in their individual capacities. FN10), id. at 685 F.Supp. 488-89. Also see pg. 498, FN28
>
> FN28. See Deposition of Cheryl Ann Piechowicz at pp. 49-50; Cheryl Ann Piechowicz's Answers to Interrogatories 8, 9, and 10; John I. Kennedy, Jr.'s Answers to Interrogatories 6 and 7. Each of those documents is attached as an exhibit to the Motion for Summary Judgment filed by the government in this case.

Likewise the defendants subsequently knowingly providing the identical same information later to the news media. **See Defendants Exhibit (G) attached to their Summary Judgment Motion).**

**Plaintiff's Response To Defendants Argument II.**

**Contrary To The Civil Division Defendants' Arguments The Have In Fact Improperly Withheld Records Upon Their Erroneous Reliance's On Exemptions 7 (C). 5 U.S.C. 552 & 552 (b) (7) (C).**

Although plaintiff agrees with the defendants that Exemption 7 protects "records or information compiled for law enforcement purposes" to the extent disclosure could "reasonably be expected to" cause one the harms enumerated under the subsection

of the exemption. 5 U.S.C. & 552 (b) (7). Nonetheless the requested documents in question does not fall under the umbrella of (b) (7) (C) in light of the fact the documents on there face indicate they were not compiled for law enforcement purposes because Grandison had already been arrest, charge on November 10, 1982 for possession with the intent to distribute heroin and cocaine and a handgun violation, and later indicted on November 17, 1982, and schedule for trial on March 28, 1983 for the drug and weapon offense, before David Scott Piechowicz, (Cheryl's husband), Susan C. Kennedy, (Cheryl's sister) were murdered at the Warren House Hotel on April 28, 1983.

The documents in question consists of propounded interrogatories, answers to interrogatories, and depositions created on March 30, 1987 and April 1, 1987 in respect to the civil proceedings in . Those documents clearly were not created in conjunction with any federal or state criminal investigation, or for any investigatory purposes by law enforcement. See Plaintiff's Exhibit (B) (Cheryl Ann Piechowicz Partial Deposition), and Plaintiff's Exhibit (C) (James Savage's Partial Deposition). To the contrary the thrust of the lawsuit sought damages against former Assistant U.S. Attorney James Savage, DEA agent John Ryan, and the United States for their failure to conduct an investigation into Grandison's background in order to protect her, and her husband, and sister after Cheryl Ann Piechowicz was allegedly threaten by Janet P. Moore in the hallway of former U.S. District Court Judge Joseph Howard U.S. Courtroom on March 14, 1983. See Plaintiff Grandison Exhibit (A) Decl. id. at 14, 15, and 16. Also see; Cheryl Ann Piechowicz, et al v. United States, 685 F.Supp. 486 (D. Md. 1988);

> On March 13, 1986, in this civil case, a twelve-count complaint
> was filed by surviving family members of the two victims, namely
> Cheryl Piechowicz, (FN6) Sherrie Marie Waldrup (Sherrie), (FN7)
> John I. Kennedy, Jr. (John) (FN8), and Melva Kennedy (Melva),
> (FN9) against the United States and also against Savage and Ryan
> in their individual capacities. FN10) ] id. at 685 F.Supp. 488;
> pg. 493,
>
> Plaintiffs allege that Savage and Ryan should have known of

*Grandison's record of violence, and that because of that knowledge and the information given to them by the Piechowiczes on March 14, 1983, they had a duty to protect Cheryl and David and/or to warn them of the dangers of testifying so that the Piechowiczes could have sought protection on their own. It is undisputed that the government neither offered to protect the Piechowiczes nor warned them of such danger. It is also It is also undisputed that neither David or Cheryl ever requested protection from the government. Plaintiffs, however assert that, in an attempt to lull Cheryl and David into a false sense of security, the government did not clarify the situation for them, and that Cheryl and David relied upon what plaintiffs characterizes ad "representations" by the government which were not "honest." id. at 685 F.Supp.498,*

*Unlike Miller, however, in the instant case it is undisputed that the government never offered to protect Cheryl and David, nor did the Piechowiczes seek such protection. FN28 Plaintiffs themselves characterize the issue as whether the government should have warned the Piechowiczes and/or should have offered to protect them. Plaintiffs' Response to Defendant's Motion for Summary Judgment, at p.7. id. at 685 F.Supp. 498,*

Thus although exemption (7) (C) permits an agency to withhold "records or information" if the agency demonstrates that the material was "compiled for law enforcement purposes" and that it qualifies for exclusion under at least one of the narrowly-defined criteria in subsections (A)-(F). See 5 U.S.C. & 552(b) (7) (A)-(F); FBI v. Abramson, 456 U.S. 615, 622, 102 S.Ct. 2054, 2059, 72 L.Ed. 2d 376 (1982); Keys v. United States Dept. of Justice, 830 F.2d 337, 340 (D.C. Cir. 1987). Here the evidence in the case sub judice, demonstrates it was the Civil Division defendants who submitted the attached Cheryl Ann Piechowicz's deposition, Cheryl's Answers to Interrogatories, John I. Kennedy, Jr's Answers to Interrogatories as exhibits to their Motion for Summary Judgment filed in Cheryl Ann Piechowicz, et al v. United States, 685 F.Supp. 486 (D. Md. 1988), Id. at 498 FN28. Such evidence demonstrates the documents at issue does not satisfy the threshold requirements legally required by the defendants to establishes constitute "investigatory records compiled for law enforcement" pursuant to (b) (7) (C) of Title 5 U.S.C. &552.

9

Plaintiff's Response To Defendants Argument III.

Contrary To The Civil Division Defendants Assertions The Defendants Have Improperly Withheld Records Under The Guise Of Exemptions 7 (C), 5 U.S.C. 552 & 552 (b) (7) (C).

Assuming arguendo without deciding for the sake of argument the defendants have met the threshold requirement of Exemption 7 (C), plaintiff agrees with the defendants they must demonstrate that the disclosure of the information could reasonably be expected to lead to one of the harms identified in the subparts of the exemption. The Civil Division defendants in the case sub judice has invoked Exemption 7(C) as the justification for withholding documents it alleges are law enforcement information that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. & 552 (b) (7) (C). Nonetheless, examination of the Civil Division defendants reliance's on Exemption (7) (C) reveal such reliance's are based upon bald allegations unsupported by facts, that somehow 25 years later the witnesses, and that so-called targets of an investigation, and even those mentioned incidentally in these alleged law enforcement records, face the possibility of retaliation or harassment and would suffer an unwarranted invasion of personal privacy if there identifies were disclosed, See Defendants' Kovakas Decl. && 18, 19, 21, and the Piechowicz case itself somehow illustrates the significant risks of retaliation and harassment that could reasonably result from the disclosure of the identifies of the individuals who are associated with a criminal investigation in general, and with Grandison's in particular, (See Defendants' Kovakas Decl. && 19, 21.). Or in addition, the defendants contend, the release of the identifies of law enforcement agents "could compromise their ability to conduct information that was complied for a specific criminal investigation and prosecution. See Defendants' Kovakas Decl. & 17.).

All of these arguments advanced by the defendants are not only unrealistic in light of the fact the identifies of the individuals in the non law enforcement documents plaintiff's seeks from the defendant has already been released to the general public more

than twenty (20) years ago. See Plaintiff's Grandison Exhibit (B) (Cheryl Ann Piechowicz Partial Deposition), and Plaintiff's Grandison Exhibit (C) (James Savage Partial Deposition). Which establishes these documents reveal the identifies of the individuals who were either alleged associated with a criminal investigation in general, and with Grandison's in particular or just in passing has been readily available to the general public for more than twenty years. See Plaintiff's Grandison Exhibit (A) (Plaintiff's Grandison Decl) id. at 2, 3, and 4.

Finally in respect to the defendants (Civil Division) reliance's on there arguments discussed previously in connection with Exemption 6, they alleged there is no sufficient public interest to overcome the substantial privacy interests of the individuals identified in the withheld records. Those arguments are without substance in light of the fact plaintiff's Exhibits (A), (B), and (C) establishes the very individuals identities the defendants seeks to protect has been made a permanent part of the general public domain. As a result the application of Exemption 7 (C) as justification for withholding the documents only requires the Court to conduct a balance of the privacy interest at stake in revealing the materials with the public interest in their release, when the defendants claiming the exemption meets its burden of establishing the documents in question were compiled for law enforcement purposes. Reporters Comm, 489 U.S. at 762, 109 S.Ct. 1468. Here plaintiff Grandison' Exhibits (A), (B), and (C) unequivocally demonstrates the defendants has not met its burden the documents in question were compiled for law enforcement purposes. Thus there is no valid privacy interest balance the court must make, that would require the requested documents will only be revealed where 'the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake. Favish, 541 U.S. at 172, 124 S.Ct. 1570.

Considered with those precepts in mind, the defendants (Civil Division) allegations are totally without ratiocination by virtue of the fact the general public has been able to readily obtain this identical information for the last twenty years or more from the United States District Court for the District of Maryland Clerk's Office [3] in the matter of

11

Cheryl Ann Piechowicz, et al v. United States, Civil Action No. K86-802. See Plaintiff's Grandison Exhibit (A) (Plaintiff's Grandison Decl) id. at 4. Thus it is unreasonable for the Civil Division defendants to claim that disclosing this information would be an unwarranted invasion of the privacy of those named therein of the documents plaintiff seeks. When in fact the defendants (Civil Division) coalesced with those very individual persons identities the majority named in the depositions of Cheryl Piechowicz and James Savage are either decease like Cheryl Piechowicz, her father John I. Kennedy, and the court reporter, those named as law enforcement officers who are either no longer employed as DEA/FBI agents, or federal prosecutors, the defendants improperly seeks to protect from disclosure under Exemption (7) (C) are totally responsible for making their identities and testimony apart of public domain in the first place.

Plaintiff's Response To Defendants Argument IV.

Contrary To The Civil Divisions Defendants Erroneous Assertions The Individuals Identified in the Records Did Waive Their Privacy Interests Under The FOIA Pursuant to Exemptions 6, 5 U.S.C. 552 & 552 (b) (6) and 7 (C), 5 U.S.C. 552 & 552 (b) (7) (C).

In the instant case the defendants arguments that the plaintiff's claim that one of the federal agents involved in the Piechowicz case waived his privacy interests by virtue of fact he discussed the matter with the media is clearly erroneous. Defendants makes these assertions upon its reliance's upon a number of cases which have absolutely no relevance to the situation sub judice. Since the law in this area precludes an agency from withholding documents that are relevant to a FOIA request when those documents have already been disclosed to the public. See e.g. Wolf v. CIA, 473 F.3d 370, (D.C. 2007) Pub. Citizen v. Dep't of State, 276 F.3d 634, (D.C. Cir. 2002); Cottone v. Rene, 193 F.3d 550, (D.C. Cir. 1999) ("Under our public domain doctrine, materials normally immunized from

---

3. The records in the matter of Cheryl Ann Piechowicz, et al v. United States, Civil Actions No. K86-802 are store in United States District Court for the District of Maryland Archives.

*disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record.)* Id. at 554 (Citing Niagara Mohawk Power Corp v. Dep't of Energy, 169 F.3d 16, 19 (D.C. Cir. 1999). The burden of proving that withheld information is already in the public domain rests with the plaintiff, who must "point to specific information in the public that appears to duplicate that being withheld. "Wolf, 473 F.3d 378.

An examination of plaintiff Grandison's **Exhibits (A), (B), and (C)** establishes beyond any doubt plaintiff has met his burden of proving that the withheld documents of the very individuals identities that the Civil Division defendants seeks to protect has already been made a permanent part of the general public domain that duplicate that being withheld. Hence the defendants assertions that the witnesses, targets of the investigation, and even those mentioned incidentally in what the defendants erroneously classify as law enforcement records, face the possibility of retaliation or harassment and would suffer from an unwarranted invasion of personal privacy if the identifies were disclosed, the Piechowicz case itself illustrates the significant risks of retaliation and harassment that could reasonably result from the disclosure of the identifies of the individuals who are associated with a criminal investigation in general, and with Grandison's in particular, and finally the release of the identifies of law enforcement agents could compromise their ability to conduct future investigations or prosecutions, and subject them to intimidation and harassment. Such allegations are clearly unfounded and must not be even considered by the court.

**Plaintiff's Response To Defendants Argument V.**

**Contrary To The Civil Division Defendants Assertions The Defendants Did Not Provided Plaintiff With All Reasonably Segregable Portions Of The Responsive Records.**

Once again plaintiff agrees with the defendants that pursuant to 5 U.S.C. & 552 (b) and the holdings of the numerous cases cited that the FOIA imposes an obligation on agencies to release any reasonably segregable portions of records. Nonetheless, the plaintiff Grandison disagrees with the defendants (Civil Division) assertions based on Kovakas Decl. & 22.) that it has fulfilled these requirements by conducting a page-by-page

13

and line-by-line review of the responsive records in this action, or the remainder of the defendants arguments. Since the remainder of defendants arguments are discredited and made null and void in light of the fact plaintiff's **Exhibits (A), (B), and (C)** establishes beyond any doubt plaintiff has met his burden of proving that the withheld documents of the very individuals identities that the Civil Division defendants seeks to protect has already been made a permanent part of the general public domain that duplicate that being withheld. As a result the defendants withholding of interrogatories and depositions are unjustifiable.

## CONCLUSION

WHEREFORE, the plaintiff respectfully requests that this Honorable Court for the reasons set forth above, and based upon the entire record herein of plaintiff's exhibits in support thereof, plaintiff respectfully submits that the defendants Civil Division motion for summary judgment should be denied.

Respectfully, submitted

Anthony Grandison #172622

14

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _16_ day of _June_____, 2008, a copy of the foregoing Opposition Response to the Defendants Motion for Summary Judgment filed pursuant to Rule 56 was mailed by first class mail, postage prepaid to the

Ms. Caroline A. Smith (DC Bar #501942)

Attorney-Advisor

U.S. Department of Justice

Office of Information and Privacy

1425 New York Ave., N.W., Suite 11050,

Washington, D.C. 20530-0001

Anthony Grandison #172622
MACA C-46
401 E. Madison Street
Baltimore, MD. 21202

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANTHONY GRANDISON,                          *

       Plaintiffs

                                  * **CIVIL ACTION NO. 08-00024 (RJL)**

    v.

                                    *

U.S. Department of Justice, et al.,

       Defendants                          *

                    \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### :ORDER

Upon consideration of the Plaintiff, Anthony Grandison's Motion in Opposition to Defendants Civil Division's Motion for Summary Judgment, of all papers filed with respect thereto, and the entire records herein (Exhibits etc.,), and it appearing to the Court that the denial of the Defendants Civil Division's motion is warranted pursuant to Rule 56 of the Fed. R. of Civ. Proc., would be just and proper in light of the fact there exist a genuine dispute as to material fact the defendants are not entitled summary judgment as a matter of law. It is by the Court this _____ day of _____ 2008,

ORDERED that Defendants Civil Division's Motion for Summary Judgment be, and it hereby is, denied; and it is further

ORDERED that the Defendants shall immediately turn over to the Plaintiff Grandison the requested records in their unredacted version forthwith.

 

 

 

                                              _____
                                              UNITED STATES DISTRICT JUDGE

Exhibit 2

No. 08-00024 (D.D.C.)(RJL)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANTHONY GRANDISON,                                    *

        Plaintiffs

                                         * CIVIL ACTION NO. 08-00024 (RJL)

    v.

                                 *

U.S. Department of Justice, et al.,

        Defendants                                    *

                    **********************************

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE, PURSUANT TO LOCAL RULE 7 (h).

        Pursuant to Local Rule 7(h) and any other local rule. Plaintiff submits the following statement of material facts as to which there is no genuine issue:

        1. On March 18, 1986 Cheryl Ann Piechowicz, et al, filed in the United States District Court for the District of Maryland a 34 count multiple million dollar civil lawsuit against former Assistant U.S. Attorney James C. Savage, Special Agent John Ryan of the DEA in both their individual and official capacities along with the United States. The Complaint was filed without any request of the United States District Court to seal the contents of those documents that identified the names all of the parties involved as well as their respective attorneys along with the substance of their acts or lack thereof which caused the Piechowicz's and et al to bring suit against them and the United States.

        2. On May 9, 1986 former Assistant U.S. Attorney James C. Savage, Special Agent John Ryan of the DEA along with the United States in their official capacities filed through their attorneys, Assistant U.S. Attorney, Juliet Eurich, Gordan W. Daiger, Torts Branch, Civil Division, Burke M. Wong, Torts Branch, Civil Division, a 19 page motion to dismiss Cheryl Ann Piechowicz, et al Complaint against them. And former Assistant U.S.

Attorney James C. Savage, Special Agent John Ryan of the DEA in their individual capacities filed in the United States District Court for the District of Maryland through their attorneys, Assistant U.S. Attorney, Juliet Eurich, Gordan W. Daiger, Torts Branch, Civil Division, Burke M. Wong, Torts Branch, Civil Division, a 26 page motion to dismiss Cheryl Ann Piechowicz, et al Complaint against them. Each motion was filed without any request of the United States District Court to seal the contents of those documents that identified the names all of the parties involved as well as their respective attorneys along with the substance of their acts or lack thereof which caused the Piechowiczes and et al to bring suit against them.

3. Cheryl Ann Piechowicz, et al on June 25, 1986 filed in the United States District Court for the District of Maryland through their attorneys, Stephen N. Goldberg, George Hoffman a 12 page Answer to former Assistant U.S. Attorney James C. Savage, Special Agent John Ryan of the DEA in their official capacities motion dismiss. And Cheryl Ann Piechowicz, et al on June 25, 1986 filed in the United States District Court for the District of Maryland through their attorneys, Stephen N. Goldberg, George Hoffman a 11 page Answer to former Assistant U.S. Attorney James C. Savage, Special Agent John Ryan of the DEA in their individual capacities motion to dismiss. Each motion was filed without any request of the United States District Court to seal the contents of those documents that identified the names all of the parties involved as well as third parties and their respective attorneys, along with the substance of their acts or lack thereof which caused the Piechowiczes, et. al., to bring suit against them. Cheryl Ann Piechowicz, et al v. United States, No. K-86-802 (D. Md. 1989) which contain a statement of facts exposing to the general public at large of the names and substances of the individual parties the Defendants sub judice (U.S. Dept. of Justice Civil Division) seeks to deny Plaintiff under Exemptions b (6) and b (7) (C).

4. In 1986 the Cheryl Ann Piechowicz et al, attorneys propounded interrogatories on former Assistant U.S. Attorney James Savage who in turned filed an

2

answers, and defendants Savage and Ryan's attorneys *(The Government)* propounded sixteen interrogatories on Cheryl Ann. Piechowicz, and interrogatories on Cheryl's father John I. Kennedy. Both Piechowicz and Kennedy provided written answers to those interrogatories. Each motion was filed without any request for the United States District Court to seal the contents of those depositions, interrogatories identifying the names all of the parties involved, the substance of their acts or lack thereof which caused the Piechowiczes and et al to bring suit against them, their respective attorneys names, third parties, and plaintiff Grandison alleged codefendants.

5. On March 30, 1987 in <u>Cheryl Ann. Piechowicz, et al., v. United States</u>, Civil No. K-86-802, the deposition of Cheryl Ann Piechowicz was held on a Monday commencing at 9;30 a.m., at the United States Attorney's Office, 8th Floor, United States Courthouse, 101 W. Lombard Street, Baltimore, Maryland 21201 before Joseph A. Grabowski, Notary Public. Mrs. Piechowicz was deposed by Burke M. Wong on behalf of former Assistant U.S. Attorney James C. Savage, Special Agent John Ryan of the DEA, and the United States, and counsel for Cheryl Ann Piechowicz, et al., Stephen N. Goldberg, and George R. Hoffman. A document (deposition) that was made available to the general public with only one objection by Piechowicz attorney *at page 4-5 lines 16-21, and pg. 1-5,* that her current address not be made apart of the United States District Court for Maryland Public Courthouse record. ~~See Plaintiff Exhibit (A) (Grandison Decl.), and Plaintiff Grandison's Exhibit (B) (Cheryl Ann Piechowicz Partial Deposition).~~

6. On April 1, 1987 in <u>Cheryl Ann. Piechowicz, et al. v. United States</u>, Civil No. K-86-802, the deposition of James C. Savage was taken on Wednesday, commencing at 10:35 at the law firm of Cohen & Goldberg, 1228 N. Calvert Street, Baltimore, Maryland, before John McCarthy, Court Reporter, was deposed by Stephen N. Goldberg, and George R. Hoffman for Cheryl Ann Piechowicz, et al., and by Burke M. Wong on behalf of former Assistant U.S. Attorney James C. Savage, Special Agent John Ryan of the DEA and the United States. A document made available to the general public when the defendants

submitted that deposition to the United States District Court for Maryland courthouse public record. See Plaintiff Exhibit (A) (Grandison Decl.), and Plaintiff Grandison's Exhibit (C) (James Savage Partial Deposition). Also see Cheryl Ann Piechowicz, et al v. United States, 685 F.Supp. 486 (D. Md. 1988) (Civil Action Case No. K86-802) Id at 685 F.Supp. 498 FN28

FN28 See Deposition of Cheryl Ann Piechowicz at pp. 49-50; Cheryl Ann Piechowicz's Answers to Interrogatories 8, 9, and 10; John I. Kennedy, Jr.'s Answers to Interrogatories 6 and 7. Each of those documents is attached as an exhibit to the Motion for Summary Judgment filed by the government in this case.

7. On April 28, 1988 former Assistant U.S. Attorney James Savage and Cheryl Ann Piechowicz personally spoke to Baltimore Evening Sun Newspaper concerning questions they were asked, and answers they gave during their individual depositions. See Defendants Exhibit (G) Attached To Defendants Summary Judgment Motion, And Plaintiff Grandison Exhibit (A) (Grandison's Decl.)

8. The Court of Appeals for the Fourth Circuit in Piechowicz v. United States, 885 F.2d 1207, 1209 (4th Cir. 1989) issued a written opinion which contain a statement of facts exposing to the general public at large the names and substances of the individual parties the Defendants sub judice (U.S. Dept. of Justice) seeks to deny Plaintiff under Exemptions b(6) and b(7)(C). See Plaintiff Grandison's Exhibit (A) (Grandison's Decl.)

9. In 1990 Cheryl Ann Piechowicz father, John I. Kennedy, a ex Baltimore City Police Sgt., and United States District Court Security Officer died from cancer.

10. In early March 2007, plaintiff filed request for Freedom of Information Act/Privacy Act Requests to the Executive Office for United States Attorneys (EOUSA) of the Department of Justice in Washington D.C. requesting copies of the records filed in the matter of Piechowicz v. United States, No. K-86-802 (D. Md.).

11. In late March, 2007 Plaintiff had likewise filed a request for Freedom of Information Act/Privacy Act to the Office of United States Attorney for the District of Maryland.

12. On March 22, 2007 James M. Kovakas Attorney in Charge FOIA/PA unit,

4

Civil Division of the U.S. Department of Justice in Washington D.C. informed Plaintiff Grandison that his Request for certain documents pertaining to the case Cheryl Ann Piechowicz, et al. v. United States, Civil No. K-86-802 had been received and assigned control number 145-FOI-9135 to plaintiff's request.

13. On April 2, 2007 that Office informed Plaintiff in accordance with the Department of Justice regulations at 28 C.F.R. & 16.3 its Office was forwarding the request to the FOIA/PA Unit in Washington, D.C. and for Grandison to make any further inquires to the Executive Office for United States Attorneys in Washington, D.C. 20530.

14. On April 17, 2007 James M. Kovakas informed Grandison that pursuant to his request a search had been conducted of the Civil Division's file of the above-referenced case and identified the documents which plaintiff Grandison requested. However, after reviewing same he had determined that these documents identify and/or contain personal information about other witnesses from plaintiff drug trafficking case, court officials, experts, attorneys and law enforcement officials connect with that matter. And that he was withholding these documents to protect the identities and information concerning these individuals pursuant to 5 U.S.C. &552 (b)(6) and (b)(7)(C). **See Plaintiff Grandison Exhibit No. (1) (Two pages) Attached Plaintiff's Original Complaint.**

15. On May 10, 2007 Priscilla Jones, Supervisory Administrative Specialist from the U.S. Department of Justice informed Plaintiff Grandison that his administrative appeal from the action of the Civil Division in Request No. 145-FOI-9135 was received on May 8, 2007 and assigned number 07-1428 as any future correspondence with its Office. **Plaintiff Grandison Exhibit No. (2) (One page) Attached Plaintiff's Original Complaint.**

16. On May 18, 2007 the Executive Office for United States Attorneys in response to the April 2, 2007 referral informed Plaintiff it had split his request into two separate files ("requests") for the separate districts and/or subjects mentioned in the request letter. And assigned two separate numbers *07-1606 Piechowicz v. U.S. (Non-public records)*, and *07-1608 Piechowicz v. U.S. (specific public records) DMD.*

5

17. On May 21, 2007 directly after plaintiff received the May 18, 2007 letter with respect to *his Request Number 07-1606* the Executive Office for United States Attorneys informed since plaintiff had not furnished a release, death certificate, or public justification for release, the release of records concerning a third party would result in an unwarranted invasion of personal privacy and would be in violation of the Privacy Act, 5 U.S.C. & 552a. And those records were generally exempt from disclosure pursuant to sections (b)(6) and (b)(7) (C) of the Freedom of Information Act, 5 U.S.C. & 552.

18. On June 5, 2007 plaintiff appealed the decision and on June 20, 2007 the defendants representative Priscilla Jones, Supervisory Administrative Specialist of the U.S. Department of Justice acknowledged receipt on June 14, 2007 of plaintiff's administrative appeal from the Executive Office for United States Attorneys decision in Request No. 07-1606, and assigned the correspondence appeal number 07-1706.

19. On June 29, 2007 subsequent thereafter the *United States Department of Justice* Freedom of Information Act/Privacy Act Unit informed Grandison by letter in respect to *Request number 07-1608* as follows; *1. [ ] A search for records located in this office has revealed no records. 2. [X] A search for records located in the United States Attorney's Office(s) for the District of Maryland (DMD) has revealed no records. 3. [ ] The records which you have requested cannot be located. 4. [ ] This office is continuing its work on the other subject/districts mentioned in your request. 5. [X] This is the final action my office will take on this particular request.*

20. On August 2, 2007 the U.S. Department of Justice through its FOIA/Privacy Act representative Associate Director, Janice Galli McLeod ipso facto reversed the decision of Civil Division attorney James M. Kovakas by ruling in Plaintiff Grandison second administrative appeal Grandison was entitled to the very same records the "EOUSA" of the Dept. of Justice had denied Grandison. **See Plaintiff Exhibit (D) (Administrative Appeal Division Associate Director Janice Galli McLeod Decision Dated August 2, 2007), and Plaintiff Exhibit (A) (Grandison's Decl.).**

21. On August 21, 2007 the U.S. Department of Justice Executive Office for United States Attorneys communicated to Plaintiff its office had received the remand and that it had been assigned number 07-2750 (Piechowicz v. U.S. (Non-public records).

22. On September 13, 2007 Plaintiff Grandison advised the U.S. Department of Justice Executive Office for United States Attorneys that those records had been earlier located on April 17, 2007 as acknowledged by Mr. James M. Kovakas the "Attorney In Charge" FOIA/PA Office, Civil Division in "FOIA APPEAL" Control Number 145-FOI-9135. Thus its was no reason for a continue delay in turning them over. See Plaintiff Grandison Exhibit No. (4) (Two pages) Attached To Plaintiff's Original Complaint.

23. On November 13, 2007 plaintiff commenced civil action seeking the Cheryl Ann Piechowicz, et al. v. United States, No. K-86-802 documents the Defendants Civil Division and by the Executive Office for United States Attorneys, components of the United States Department of Justice, which was received by the Court on November 17, 2007 as the Court's docket entries will reflect.

24. On February 13, 2008 the Defendants filed a document titled PRECIPE requesting the Clerk's Office to enter the appearance of Caroline A. Smith as principal counsel for defendants in the above captioned case.

25. On February 14, 2008 Plaintiff propounded his first set of 13 Interrogatories on the defendants counsel for answers.

26. On February 15, 2008, the defendants' filed an late Answer to the Complaint without serving a copy on the plaintiff until April 11, 2008.

27. On February 19, 2008 the defendants by letter through its agent Janice Galli McLeod informed plaintiff that its department regrets the delay in responding to his appeal "Appeal No. 07-1428" (Request No. 145-FOI-9135 ALB:CG) from the action taken by the Executive Office for United States Attorneys (EOUSA) concerning plaintiff request for access to records pertaining to Piechowicz v. United States, Civil No. K-86-802 (D.D.C.). And that it was closing plaintiff's appeal in accordance with 28 C.F.R. & 16.9(a)(3) (2007)

7

because it had been informed plaintiff had filed a lawsuit in the United States District Court for the District of Columbia.

28. On March 7, 2008 the Court issued an order directing the Defendants to file a dispositive motion or a proposed schedule to govern future proceedings by April 1, 2008.

29. On April 1, 2008 without consulting plaintiff, the defendants filed "Defendants Proposed Schedule" seeking a five month scheduling order, whereas, the defendants would file their dispositive motion on or before May 20, 2008; plaintiff would file his opposition and/or cross motion on or before June 17, 2008; defendants would file their reply and/or opposition, if any, on or before August 12, 2008. Attached with a proposed scheduling order based on defendants opinion it was highly unlikely this case would be resolved by dispositive motion.

30. On April 7, 2008 plaintiff filed an Motion in Opposition to the defendants Proposed Scheduling Order.

31. On April 11, 2008 the defendants filed a Response to Plaintiff Opposition Motion.

32. On April 16, 2008 plaintiff filed a reply to the defendants response.

33. On April 23, 2008 the Defendants counsel filed an untimely Motion for a Protective Order pursuant to Rule 26 (c) FRCP, that sought that plaintiff's request for discovery, including his interrogatories dated February 14, 2008 be denied, unless and until a further Order of the Court.

34. On April 29, 2008 Plaintiff received from the defendants Civil Division an heavy redacted portions of the records of Cheryl Ann Piechowicz's deposition and answers to interrogatories propounded upon her by the Defendants. Nonetheless still maintaining the redacted portions of the records are being withheld to protect the identities and personal privacy of these individuals under 5 U.S.C. 552(b)(6) and (b)(7)(C). A decision made more than a year after Plaintiff had made his request and almost one year after Plaintiff had filed

8

his administrative appeal from the action of the Civil Division in Request No. 145-FOI-9135.

35. On May 12, 2008 Plaintiff filed a Motion to Compel Discovery and attached Affidavit in Support thereto pursuant to Rule 33 FRCP.

36. On May 20, 2008 the Defendants' (Executive Office for United States Attorneys' filed a Motion to Vacate the Briefing Schedule.

37. On May 20, 2008 the Defendants' (Civil Division) filed a Motions for Summary Judgment.

38. On May 22, 2008 Plaintiff filed a Motion for In Camera Review.

39. On May 22, 2008 the Court issued three Orders, that plaintiff file his response to the defendants summary judgment motion by June 17, 2008, granting the defendants' Executive Office of United States Attorneys (EOUSA) Motion to Vacate the Briefing Schedule and ordering defendants to file a status report on or before June 12, 2008, and file a proposed briefing schedule on or before June 30, 2008, and denying plaintiff's motion to compel discovery without prejudice.

40. On June , 2008 the Defendants' filed a Motion in Opposition to Plaintiff's Motion for In Camera Review of the documents in question in there unredacted versions by the district court.

Respectfully, submitted,

Anthony Grandison #172622
MCAC C-46
401 E. Madison Street
Baltimore, MD 21202

DATED: June, _16_ , 2008

# Exhibit 3

No. 08-00024 (D.D.C.)(RJL)

Plaintiff's Exhibit (A)
(Grandison Declaration)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ANTHONY GRANDISON,                        *

      Plaintiffs

                           * CIVIL ACTION NO. 08-00024 (RJL)

      v.

U.S. Department of Justice, et al.,

      Defendants                        *

                     ****************************************

## DECLARATION OF PLAINTIFF ANTHONY GRANDISON

## I. INTRODUCTION

      I, Anthony Grandison, make the following declaration under penalty of perjury.

1. I am the Plaintiff Anthony Grandison proceeding pro se in the above captioned case who sought from the United States District Court for the District of Maryland Clerk's Office copies of the lawsuit filed by Cheryl Ann Piechowicz, et al in the matter of Cheryl Ann Piechowicz, et al v. United States, No. K-86-802 (D. Md. 1986), any and all answers, motions filed by the defendants former Assistant U.S. Attorney James Savage, DEA agent, John Ryan, and the United States to the lawsuit, any and all replies filed by Plaintiffs' Cheryl Ann Piechowicz, et al, any and all depositions filed in that case by either the Plaintiffs or the Defendants.

2. I, the Plaintiff Anthony Grandison received at the governments expense from the United States District Court for the District of Maryland Clerk's Office a copy of the lawsuit filed by Cheryl Ann Piechowicz, et al in the matter of Cheryl Ann Piechowicz, et al v. United States, No. K-86-802 (D. Md. 1986), copies of any and all answers, motions filed by the defendants former Assistant U.S. Attorney James Savage, DEA agent, John Ryan, and the United States to the lawsuit, any and all replies filed by Plaintiffs' Cheryl Ann Piechowicz, et al, to the defendants Savage, Ryan, and the United States Motions to Dismiss. All documents which were unredacted and readily available to the general public at large.

3. I, the Plaintiff Anthony Grandison likewise received at the governments expense from the United States District Court for the District of Maryland Clerk's Office partial copies of the March 30, 1987 deposition of Cheryl Ann Piechowicz, and copies of the April 1, 1987 partial deposition of former Assistant U.S. Attorney, James Savage filed in the matter of Cheryl Ann Piechowicz, et al v. United States, No. K-86-802 (D. Md. 1986). See Plaintiff Grandison's Exhibit (B) and (C).

4. The combine depositions of Piechowicz and Savage which were unredacted and readily available to the general public at large contains the names of persons who were either civilian witnesses, FBI or DEA agents, Federal Prosecutors, in plaintiff's drug case, third parties, Cheryl Piechowicz's sister, daughter, father, mother, hotel employees, Court Clerks, alleged codefendants of Plaintiff Grandison, etc.,. For instants the following names are found in Cheryl Ann Piechowicz March 30, 1987 Deposition See Plaintiff Exhibit (B) (Cheryl Ann Piechowicz March 30, 1987 Partial Deposition).

Front page; Stephen M. Goldberg, Esq., George R. Hoffman, Esq., attorneys for Piechowicz, et al, Burke M. Wong, Esq., attorney for Savage, Ryan, and the Government, Court reporter, Joseph A. Grabowski,

Pg. 8. Sharrie Maria Waldrup, (Cheryl Ann Piechowicz daughter by her first marriage), Scott Piechowicz (murder victim)

Pg. 21. Luther Pugh

Pg. 23. Agent O'Connell, Savage,

Pg. 24. Agent Kevin O'Connell, Savage, Agent Ryan, Janet Moore,

Pg. 30. Agent Ryan, O'Connell, Scott

Pg. 31. Agent Ryan, Janet Moore, Savage,

Pg. 32. Scott Piechowicz, Savage, agent Ryan,

Pg. 33. Agent Ryan, Janet Moore,

Pg. 34. Agent Ryan, Savage,

Pg. 35. Scott,

2

Pg. 49. Janet Moore,

Pg. 50. James Savage, Father of Cheryl Piechowicz,

Pg. 56. Savage, O'Connell, Scott Piechowicz, Ryan, Susan Kennedy,

Pg. 88. Joseph A. Grabowski, Court Reporter, Cheryl Ann Piechowicz.

And the following names are found in James Savage's April 1, 1987 Deposition, **See Plaintiff**

**Grandison's Exhibit (C) (James Savage April 1, 1987 Partial Deposition)**.

Front page; Stephen M. Goldberg, Esq., George R. Hoffman, Esq., attorneys for Piechowicz,

et al, Burke M. Wong, Esq., attorney for Savage, Ryan, and the Government, Court reporter,

John McCarty.

Pg. 16. Agent Kevin O'Connell, Agent Jack Ryan,

Pg. 20. Peanut King

Pg. 21. Agent Ryan, Baltimore City Police Dept.,

Pg. 22. Agent Ryan

Pg. 23. Federal Offense of Assault

Pg. 25. Agent Jack Ryan, Cheryl Piechowicz, Janet Moore,

Pg. 26. Judge Howard, Ed Smith (Grandison's former attorney), Mr. Wong,

Pg. 27. Judge Howard, Janet Moore,

Pg. 28 Supervisors from DEA/FBI, Judge

Pg. 29. Janet Moore, Judge Howard,

Pg. 30. Vernon Evans,

Pg. 31. Cheryl and Scott Piechowicz, Agent Jack Ryan, Judge Howard,

Pg. 32. Agent Jack Ryan, Luther Pugh, Cheryl and Scott Piechowicz,

Pg. 33. Cheryl Piechowicz, Agent Ryan,

Pg. 34. Agent Jack Ryan, Cheryl Piechowicz,

Pg. 35. Cheryl and Scott Piechowicz, Janet Moore, Judge Howard, Agent Ryan,

Pg. 40. Cheryl and Scott Piechowicz,

Pg. 41. Cheryl Piechowicz,

Pg. 42. Cheryl Piechowicz, Sugar Ray Leonard, Janet Moore, Scott Piechowicz,

Pg. 43. Wendy Grandison, Janet Moore,

Pg. 44. Janet Moore, Cheryl and Scott Piechowicz, Agent Ryan, Agent O'Connell,

Pg. 46. Cheryl Piechowicz,

Pg. 47. Cheryl Piechowicz, Scott Piechowicz, Grandison

Pg. 48. Cheryl Piechowicz, Grandison

Pg. 68. Joseph Howard Jr. , Judge

Pg. 72. Luther Pugh,

Pg. 97. Cheryl Piechowicz

Pg. 99. Mr. Wong,

Pg. 100. Goldberg, Savage,

Pg. 105. Savage, John McCarty

5. The lawsuit filed by the plaintiffs in Cheryl Ann Piechowicz, et al v. United States, supra had absolutely no direct connection involving the Government investigation, arrest, or prosecution of Plaintiff Grandison for possession with the intent to distribute heroin and cocaine and a handgun violation. Because Grandison had already been arrest, charge on November 10, 1982, indicted on November 17, 1982, and schedule for trial on March 28, 1983 for the drug and weapon offense, before David Scott Piechowicz, (Cheryl's husband), Susan C. Kennedy, (Cheryl's sister) were murdered at the Warren House Hotel on April 28, 1983. Instead the plaintiffs in Cheryl Ann Piechowicz, et al v. United States, supra lawsuit sought damages against former Assistant U.S. Attorney James Savage, DEA agent John Ryan, and the United States failure to protect her, and her husband and sister after Cheryl Ann Piechowicz was allegedly threaten by Janet P. Moore in the hallway of the U.S. courtroom the former U.S. District Court Judge, Joseph Howard (decease) on March 14, 1983.

6. While Cheryl Ann Piechowicz testified at her deposition on March 30, 1987 of being threaten on March 14, 1983 by Janet Moore. The former Assistant U.S. Attorney James Savage testified during his April 1, 1987 deposition, the information related by Cheryl Ann

4

Piechowicz, and DEA agent John Ryan (a.k.a. Jack Ryan) to him (Savage) did not constitute a threat by Janet Moore. Testimony that was contrary to Savage testimony given during plaintiff Grandison's Federal Civil Rights trial in 1983, and state capital punishment trial in 1984 in Somerset County Circuit Court.

7. On May 11, or 19, 1994 plaintiff Grandison's former standby attorney William Purpura in his 1983 federal trial, who would later become Grandison's attorney in his 1994 capital punishment resentencing hearing before being discharged. Testified before the Honorable Daniel M. Long (a Somerset Circuit Court Judge) on May 11, or 19, 1994 that Cheryl Ann Piechowicz, father John I. Kennedy (formerly a Baltimore City Police Sgt., and U.S. District Court, Courthouse Security Officer) Purpura knew personally at the Federal courthouse died of lung cancer in 1990.

8. During Plaintiff Grandison's May and June 1994 capital punishment resentencing proceeding John I. Kennedy's statement given in a 1984 presentence report was read to the jury because Kennedy was decease.

9. United States District Court of Maryland, the former Honorable Judge Joseph Howard died in the 1990's.

10. On March 30, 1987 in Cheryl Ann. Piechowicz, et al., v. United States, Civil No. K-86-802, the deposition of Cheryl Ann Piechowicz was held on a Monday commencing at 9:30 a.m., at the United States Attorney's Office, 8th Floor, United States Courthouse, 101 W. Lombard Street, Baltimore, Maryland 21201 before Joseph A. Grabowski, Notary Public. Mrs. Piechowicz was deposed by Burke M. Wong on behalf of former Assistant U.S. Attorney James C. Savage, Special Agent John Ryan of the DEA, and the United States, and counsel for Cheryl Ann Piechowicz, et al., Stephen N. Goldberg, and George R. Hoffman. A document (deposition) that was made available to the general public with only one objection by Piechowicz attorney *at page 4-5 lines 16-21, and pg. 1-5,* that her current address not be made apart of the United States District Court for Maryland Public Courthouse record. See Plaintiff Grandison's Exhibit (B) (Cheryl Ann Piechowicz Partial Deposition).

5

11. On April 1, 1987 in Cheryl Ann Piechowicz, et al., v. United States, Civil No. K-86-802, the deposition of James C. Savage was taken on Wednesday, commencing at 10:35 at the law firm of Cohen & Goldberg, 1228 N. Calvert Street, Baltimore, Maryland, before John McCarthy, Court Reporter, was deposed by Stephen N. Goldberg, and George R. Hoffman for Cheryl Ann Piechowicz, et al., and by Burke M. Wong on behalf of former Assistant U.S. Attorney James C. Savage, Special Agent John Ryan of the DEA and the United States. A document made available to the general public when the defendants submitted that deposition to the United States District Court for Maryland courthouse public record. See Plaintiff Grandison's Exhibit (C) (James Savage Partial Deposition).

12. On April 28, 1988 former Assistant U.S. Attorney James Savage and Cheryl Ann Piechowicz personally spoke to Baltimore Evening Sun Newspaper concerning questions they were asked, and answers they gave during their individual depositions. See Defendants Exhibit (G) Attached To Defendants Summary Judgment Motion, (Baltimore Evening Sun Newspaper Dated April 28, 1988).

13. In Piechowicz v. United States, 885 F.2d 1207, 1209 (4th Cir. 1989) the Court of Appeals for the Fourth Circuit issued a written publication opinion readily available to the general public at large which contain a statement of facts exposing the names and substances of the individual parties, the defendants sub judice (U.S. Dept. of Justice) seeks to deny Plaintiff under Exemptions b(6) and b (7) (C).

14. The facts, as alleged in the Complaint Cheryl Ann Piechowicz, et al v. United States K-86-802, are as follows, The United States had subpoenaed David Scott and Cheryl Ann Piechowicz as witnesses in the criminal prosecution of one Anthony Grandison ("Grandison") for both a pre-trial hearing on March 14, 1983 as well as for a trial scheduled for May 3, 1983, for violations of federal narcotics and firearms law. On or about March 14, 1983, Grandison, through an agent, threatened the Piechowiczes in an attempt to prevent them from testifying truthfully against him. The Piechowiczes immediately advised the defendants, James Savage ("Savage"), an Assistant United States Attorney, and John Ryan ("Ryan"), an agent of the

6

Drug Enforcement Agency, both of whom were involved with and had the responsibility for the prosecution of Grandison. The defendants advised the Piechowiczes not to worry and to testify truthfully at the pre-trial hearing which they did. In the course of that testimony they revealed that they worked at the Warren House Hotel. (Complaint, paragraphs 8, 10, 12, and 13).

15. On a number of occasions prior to the trial scheduled for May 3, 1983, the Piechowiczes expressed their concerns about the threat to both Savage and Ryan but their concerns were ignored and dismissed. Savage and Ryan repeatedly advised them that there was nothing to worry about. The defendants knew or should have known that Grandison had an extensive criminal record involving crimes of violence, narcotics and firearm violations. In particular the defendants knew or should have known that Grandison had previously been charged, as part of alleged attempted contract murder, with obstruction of a criminal investigation and willfully injuring a witness, in the very same United States District Court for the District of Maryland. An affidavit from a Drug Enforcement Agent in that case is an exhibit in the Complaint. No action whatsoever was taken by the United States, Savage or Ryan, to protect the Piechowiczes or to advise them of the dangers involved in testifying against Grandison. On April 28, 1983, just five days prior to the trial, David Piechowicz and Susan Kennedy, Cheryl Piechowicz's sister, were murdered while working at the Warren House Hotel. It was later shown that David Piechowicz was murdered to prevent his testimony against Grandison and that Susan Kennedy, was murdered in the mistaken belief that she was Cheryl Ann Piechowicz. (Complaint paragraphs 11, 15, and 16).

16. Plaintiffs ("the Piechowiczes, et. al") allege that the deaths of David Scott Piechowicz and Susan Kennedy occurred as a direct and proximate result of the negligence of the Defendant United States and its agents in failing to provided protection for the Piechowiczes and Susan Kennedy, although they continued to work at the Warren House Hotel, in failing to reveal Grandison's extensive criminal record and previous attempts to injure witnesses, and in failing to advise the Piechowiczes of the possible dangers that they would expose themselves to by

testifying against Grandison, and thereby enable them to seek adequate protection on their own. The repeated concerns of the Piechowiczes concerning their safety were ignored and made light of , in an attempt to lull them into a false sense of security. The actions of Savage and Ryan wee done with reckless disregard for the rights of the Plaintiffs. (Complaint at paragraphs 17, 18, and 27). This action was brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. Sec. 2671 et seq. by the estates of the two victims as well as their survivors.

## II. ADMINISTRATIVE PROCESSING OF PLAINTIFF REQUEST

17. In early March 2007, plaintiff filed request for Freedom of Information Act/Privacy Act Requests to the Executive Office for United States Attorneys (EOUSA) of the Department of Justice in Washington D.C. requesting copies of the records filed in the matter of Piechowicz v. United States, No. K-86-802 (D. Md.).

18. In late March, 2007 Plaintiff had likewise filed a request for Freedom of Information Act/Privacy Act to the Office of United States Attorney for the District of Maryland.

On April 17, 2007 James M. Kovakas informed Grandison that pursuant to his request a search had been conducted of the Civil Division's file of the above-referenced case and identified the documents which plaintiff Grandison requested. However, after reviewing same he had determined that these documents identify and/or contain personal information about other witnesses from plaintiff drug trafficking case, court officials, experts, attorneys and law enforcement officials connect with that matter. And that he was withholding these documents to protect the identities and information concerning these individuals pursuant to 5 U.S.C. &552 (b)(6) and (b)(7)(C). See Plaintiff Grandison Exhibit No. (1) (Two pages) Attached Plaintiff's Original Complaint.

19. On August 2, 2007 the U.S. Department of Justice through its FOIA/Privacy Act representative Associate Director, Janice Galli McLeod ipso facto reversed the April 17, 2007 decision of Civil Division attorney James M. Kovakas denying plaintiff request for the record, because the administrative appeal division director ruled in plaintiff's second administrative

appeal that Grandison was entitled to the records the "EOUSA" of the Dept. of Justice had denied Grandison. (The identical records Grandison sought from the Civil Division of the Dept. of Justice). See Plaintiff Exhibit (D) (Administrative Appeal Division Associate Director Janice Galli McLeod Decision Dated August 2, 2007).

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and believe.

Executed on this day _16_ of June, 2008.

Anthony Grandison #172622, Pro Se Plaintiff
MCAC C-46
401 E. Madison Street
Baltimore, MD 21202

# Exhibit 4

No. 08-00024 (D.D.C.)(RJL)

Plaintiff's Exhibit (B)
(Cheryl Ann Piechowicz's )
(March 30, 1987 Deposition)

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
2
   CHERYL ANN PIECHOWICZ, et al      *
3
                  Plaintiffs          *
4
        vs.                           *    CIVIL ACTION NO. K-86-802
5
   UNITED STATES OF AMERICA           *
6
                  Defendant           *
7
                              *    *    *
8
           The deposition of CHERYL ANN PIECHOWICZ was held on
9
   Monday, March 30, 1987 commencing at 9:30 a.m., at the United
10
   States Attorney's Office, 8th Floor, United States Courthouse,
11
   101 West Lombard Street, Baltimore, Maryland 21201 before
12
   Joseph A. Grabowski, Notary Public.
13
                              *    *    *
14
   APPEARANCES:
15
               STEPHEN N. GOLDBERG, ESQUIRE
16                    and
               GEORGE R. HOFFMAN, ESQUIRE
17                    On behalf of the Plaintiffs

18             BURKE M. WONG, ESQUIRE
                      On behalf of the Defendant
19

20  REPORTED BY:

21  Joseph A. Grabowski, RPR
```

1      A      I was a desk clerk.

2      Q      What was his job there?

3      A      Scott was the manager of the hotel.

4      Q      Did your ex-husband pay child support for Sherrie

5   Marie Waldrup?

6      A      No.

7      Q      Did he pay any kind of alimony?

8      A      No.

9      Q      Did Scott ever adopt Sherrie Marie Waldrup?

10      A      No.

11      Q      Was he ever appointed legal guardian of her?

12      A      No.

13      Q      So there is basically no  legal relationship

14   between Sherrie Marie Waldrup and Scott Piechowicz?

15      A      To my understanding legally there is not.

16      Q      What was Scott's educational background?

17      A      Scott graduated from high school, continued his

18   education at the University of Maryland in College Park,

19   and received a Bachelor's degree in four years.

20      Q      What was his specialty at Maryland?

21      A      He majored in history and humanities.  His goal was

1    A    I and other witnesses observed a woman that was

2    walking around, glaring at witnesses, storming in and out

3    of the courtroom, very hardening, hardening woman,

4    glaring at people.  Obviously catching the attention of

5    quite a few people.

6    Q    Could you describe the woman physically,

7    what she looked like?

8    A    She was black.

9    Q    Was she tall, short, fat, skinny?

10   A    She was of medium build.  Maybe my height.

11   I do know that she was wearing very high heels that day.

12   Q    You don't recall whether she was heavy set or

13   skinny?

14   A    She wasn't skinny, and she wasn't heavy set.

15   I'm not going to even estimate what her weight may be.

16   If I saw her today I could identify her.

17   Q    Was she carrying anything with her?

18   A    Not that I know of.

19   Q    What exactly did she say to anybody, was this

20   inside the witness room, or was it just outside the courthouse?

21   A    This was directly outside the courtroom.

1      Q      Did she say anything to anybody?

2      A      I watched her for quite awhile.  I noticed at one

3  point she spoke to another witness, Luther Pugh.

4      Q      Do you recall what she said?

5      A      I wasn't within hearing distance.

6      Q      Did you see what Mr. Pugh's reaction was?

7      A      No, I didn't.  I only know that she left quickly.

8      Q      You say she left quickly.  What do you mean by she

9  left quickly?

10     A      She left his side.

11     Q      She just walked away very briskly?

12     A      She walked away, uh-huh.

13     Q      What did she do after that?

14     A      She approached me.  At that point I was sitting

15  on a bench, again outside of the courtroom.

16     Q      What did she say to you, if anything?

17     A      The first thing she said to me was do I have a

18  light.  I just lit a cigarette.  I gave her a light.

19         She sat down beside me.  I was uncomfortable

20  with this, because of her earlier presence.  She asked who

21  I was.

1     Q     What did you respond?

2     A     I remember asking her who she was.

3     Q     What did she say?

4     A     She didn't say anything at first.  She asked

5  if I was going in there, and she pointed to the courtroom.

6  And I said yes.

7          She wanted to know what my testimony was going

8  to be about, who was I testifying for.  And I told her I was

9  subpoenaed by the government.

10    Q     What was her response to that?

11    A     She wanted to know in fact what it was I was going

12  to testify to.  Because she was in and out of the courtroom

13  earlier, I knew that she was going to hear my testimony,

14  so I decided to tell her what I was testifying to.

15    Q     What did you tell her?

16    A     I told her I worked out at the Warren House Hotel,

17  and I overheard a conversation between Anthony Grandison

18  and my husband.

19         She asked what hotel it was.  I said the Warren

20  House.

21         That was the first time her attitude changed.

1    She wanted to know if Anthony Grandison was there alone,

2    and I told her that, yes, he was when I saw him.

3              She seemed to be satisfied with that answer and

4    continued.  She wanted to know who my husband was, and that

5    is when I recall him talking to Agent O'Connell.  I pointed

6    him out.

7         Q     Was O'Connell present?

8         A     He was outside of the courtroom also.

9              She responded that she thought my husband was an

10   attorney.  And I said no.

11             She had told me that I better say that I never

12   saw him before in my life.  I didn't respond to that, and

13   she didn't phrase it as though a question.  She didn't want a

14   response.

15        Q     What was your reaction?   What did you feel

16   about that?

17        A     I was very nervous from the moment I saw that

18   woman.  I was nervous when she sat down next to me.

19   I was even more nervous when her first questions were what

20   my testimony was concerning.

21        Q     Did, at any time, Mr. Savage or any of the agents

24

1    ever tell you not to discuss your testimony with anybody?

2         A    No.

3         Q    You stated Special Agent O'Connell was present

4    there.  Did you speak to him immediately after this incident

5    occurred?

6         A    No, I didn't.

7         Q    Why not?

8         A    It was a matter of seconds after Janet Moore

9    arose that I was called as a witness into the courtroom.

10        Q    Who called you into the courtroom?

11        A    I don't recall.

12        Q    Would it have been the bailiff?

13        A    I imagine it was the bailiff.

14        Q    Did you have an opportunity to speak with

15   Special Agent O'Connell?

16        A    No.

17        Q    What about Mr. Savage?

18        A    No.

19        Q    So you told neither Savage nor Ryan immediately

20   after this woman made this statement to you --

21        A    I had no opportunity to.

1  isn't that correct?

2      A    Yes, I was.

3      Q    Do you recall what Anthony Grandison was doing

4  as you testified?

5      A    No, I don't.

6      Q    After you were through testifying, you

7  communicated this incident to Scott.  What did Scott say?

8      A    I mentioned to Scott that I thought we should

9  tell someone.

10     Q    What did he say in response to that?

11     A    He agreed.

12     Q    So what did you do?

13     A    We saw Agent Ryan, and I told him.

14     Q    Where did you see him?

15     A    I don't recall if it was right outside of the

16  courtroom door.

17     Q    Was anybody else present?

18     A    Not to my knowledge.

19     Q    O'Connell was not there?

20     A    I don't know where he was at that point.  Agent

21  O'Connell and Jack Ryan both were in and out of the courtroom.

31

1     I don't recall where Agent O'Connell was at that point.

2          Q     Do you recall if you were the last witness on

3     that day?

4          A     No, I don't recall.

5          Q     Do you recall if Jim Savage was still in the

6     courtroom at that time?

7          A     Yes, he was.

8          Q     What was Special Agent Ryan's reaction once

9     you communicated this incident to him?

10         A     He seemed very interested.

11         Q     Could you please describe what you mean by

12    interested?

13         A     I relayed exactly what had transpired between

14    Janet Moore and myself.  He asked me to identify the woman.

15    I had already told him that she introduced herself as Tony's

16    wife.  I pointed her out to Agent Ryan, and he said that

17    that was Janet Moore, Anthony Grandison's common law wife.

18         Q     You distinctly recall that Special Agent Ryan

19    stated that that is Janet Moore?

20         A     Yes!

21         Q     What did he do?

32

1       A      As I said, I relayed exactly what transpired

2   between the two of us.  He seemed very concerned.  He said

3   this was nothing to take lightly, we need to report this

4   to U.S. Attorney Savage.

5       Q      Where was Scott at this time?

6       A      Scott was right at my side.

7       Q      So did you report it to Ryan, or did Scott

8   report it to Ryan?

9       A      I reported it to Ryan.

10      Q      And this was right outside the courtroom?

11      A      Yes.

12      Q      Where did you go from there after Ryan said he should

13  report this to Jim Savage?

14      A      To Jim Savage's office.

15      Q      Was Jim Savage there?

16      A      Yes, he was.

17      Q      I thought you said previously he was in the

18  courtroom still.

19      A      I thought that he was.  I thought he was.

20  Evidently -- I'm assuming that he could have gotten to his

21  office from his courtroom without passing myself and Jack Ryan,

33

1    but we walked immediately to his office.

2         Q    Do you recall about what time of day this was?

3         A    No, I don't.

4         Q    Would it have been after lunch or before lunch?

5         A    I have no idea.

6         Q    What was said to Mr. Savage?

7         A    Jack Ryan relayed most of what I had relayed

8    to him, all of what I had relayed to Jack Ryan.  I assume

9    that Mr. Savage was listening, and told me that he was glad

10   that I made them aware of it, but he didn't think it was

11   anything to worry about.  That Janet Moore was just upset,

12   that she knows that we have him this time.

13        Q    He referred to her by name?

14        A    Yes.

15        Q    Are you absolutely certain about that?

16        A    I'm not going to say I'm absolutely certain, no.

17   I do recall that I found out her name that day, and I'm going

18   to assume that one of those two told me her name.

19        Q    So further describe what he did in response to

20   Ryan reporting this to you.

21        A    I'm sorry, where did I leave off?

1    (The reporter read back a portion of the

2  previous testimony.)

3    THE WITNESS:  She should have concerned herself

4  with this a long time ago.  And I feel it is also important

5  to mention that I never really felt as though he took

6  what I or Jack Ryan relayed seriously.  When we got to his

7  office, he was shuffling papers, and he was shuffling papers

8  on his desk throughout the conversation with Jack Ryan and

9  myself.

10    He did look up at me when I said that he told me

11  there was nothing to worry about, that she's just upset.

12    Q    Did he indicate what he was going to do?

13    A    At that point I noticed that Jack Ryan looked

14  surprised, and Jack Ryan asked him if he was going to report

15  this as a threat.  James Savage responded that he didn't

16  feel it was necessary.  And again said to me that he didn't

17  think anything would come of it.  That she was just upset.

18    Q    What did Jack Ryan do in response to that?

19    A    Jack Ryan gave me his card.

20    Q    What did he say?

21    A    He said that if anything ever happened concerning

1    the trial, not to hesitate to call him.  That he could get to

2    me and Scott within a matter of five minutes.

3         Q    Did he also mention to you that 911 is an

4    emergency number that you could always call at any time?

5         A    No, he didn't.

6         Q    You don't recall him saying something to that

7    effect?

8         A    I know he didn't say anything to that effect.

9         Q    Did he give you his business number, his home

10   number?

11        A    He gave me a business card.

12        Q    Did it have his home number on it?

13        A    I don't recall.

14        Q    You don't recall that he wrote it on the card?

15        A    No, I don't.

16        Q    You don't recall him giving a number where he

17   could be reached 24 hours?

18        A    No, and he had never said that he was available

19   24 hours a day.  He handed me a card, identified it as a

20   business card, and I accepted it.

21        Q    He didn't give you a phone number where he could be

1      A      Uh-huh.  It was the four to twelve shifts I had a

2 problem with.  I had a daughter.

3      Q      So you --

4      A      Although I was scheduled to work it, there were

5 many times I preferred to work eight to twelve, so I could

6 spend the evening with my family.

7      Q      Did you, at any time, state that you felt

8 your life was in danger, because of the Janet Moore episode?

9      A      No, not in those words.

10      Q      Did you ever request protection?

11      A      No, I did not.

12      Q      In your answers to our interrogatories you stated

13 you were very concerned, you had a considerable amount of doubt

14 as to whether or not you were doing the right thing by testifying.

15 And there are many references in your answers as to concern.

16 But you never expressed a fear for your life.

17      A      I was very nervous.  I relayed that to James

18 Savage.  He constantly told me that there was nothing to worry

19 about, that I was doing my job as a citizen.  It was my

20 duty to testify.

21      Q      Did anybody from the United States Government ever

50

1    offer you protection?

2        A    No.

3        Q    Therefore, obviously you never relied upon any

4    protection from anybody from the United States Government.

5        A    I didn't know that it was available.

6        Q    Given your concerns about this kind of situation,

7    do you think you could have asked your father, who is a

8    police officer, about what was available?

9        A    For me to look to my father I think is totally

10   absurd.  I was introduced to a man that was the head of this

11   trial, so to speak.  I was told right from the start to direct

12   any of my questions to James Savage.  I did what was told of me.

13   I did what I thought was expected of me.  I told the person

14   I thought I should tell.

15       Q    Well, the impression I'm getting is that

16   you were not satisfied with the answers.

17       A    I was amazed at the way he would make me feel

18   for bringing it up.

19       Q    But you, at no time, thought it would be helpful

20   to call your father, who is a police officer, to say I have

21   had this problem with this U.S. attorney, I keep bringing this

1    I don't know.  I only know that I knew that James Savage

2    was in charge of this, so to speak.  He was the man on top.

3    He was the man I was told that I would be dealing with from

4    now on.

5         Q    Let me reask this question one more time.

6    Did Special Agent O'Connell, Special Agent Ryan, or

7    Assistant United States Attorney James Savage, or any

8    agent of the United States Government, ever offer to protect

9    you, Scott, or Susan Kennedy prior to April 28th, 1983?

10        A    Never.

11        Q    Did you, or Scott Piechowicz or Susan Kennedy

12   ever rely on any kind of offer of protection from Special

13   Agent O'Connell, Special Agent Ryan, Mr. Savage, or any

14   agent of the United States prior to April 28th, 1983?

15        A    No.  I relied on the truth.  That was my only

16   reliance.  I relied on the truth from James Savage.

17        Q    When did you first meet Scott Piechowicz?

18        A    When?

19        Q    Yes.

20        A    At the hotel, August of '79.  At the beginning of

21   my employment.

88

```
STATE OF MARYLAND)
                ) SS:
CITY OF BALTIMORE)
```

1

2          I, Joseph A. Grabowski, a Notary Public in and for

3   the State of Maryland, County of Baltimore, do hereby certify

4   that the within named CHERYL ANN PIECHOWICZ personally appeared

5   before me at the time and place herein set out, and after

6   having been first duly sworn according to law, was interrogated

7   by counsel.

8          I further certify that the examination was recorded

9   stenographically by me and then transcribed from my stenographic

10  notes to the within typewritten matter in a true and accurate

11  manner.

12         I further certify that the stipulations contained

13  herein were entered into by counsel in my presence.

14         I further certify that I am not of counsel to any

15  of the parties, nor an employee of counsel, nor related to

16  any of the parties, nor in any way interested in the

17  outcome of this action.

18         As witness my hand and notarial seal this 3rd day

19  of April, 1987.

20                        _____
                          Joseph A. Grabowski
21                        Notary Public

GORE BROS. REPORTING AND VIDEO CO.
115 WEST MULBERRY STREET
BALTIMORE, MD. 21201
(301) 837-3027

Exhibit 5

No. 08-00024 (D.D.C.)(RJL)

Plaintiff's Exhibit (C)
(Former Assistant U.S. Attorney James C. Savage)
(April 1, 1987 Deposition)

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHERYL ANN PIECHOWICZ, et al.,:

       Plaintiffs,      :

   v.            :     CIVIL NO. K-86-802

UNITED STATES OF AMERICA,  :

       Defendant,     :

- - -

     Deposition of <u>JAMES C. SAVAGE</u>, was taken on Wednesday, April 1, 1987, commencing at 10:35 a.m., at the law firm of Cohen & Goldberg, 1228 N. Calvert Street, Baltimore, Maryland, before John McCarthy, Court Reporter.

- - -

APPEARANCES:

      STEPHEN GOLDBERG, ESQUIRE
        On behalf of the Plaintiffs

      GEORGE R. HOFFMAN, ESQUIRE
        On behalf of the Plaintiffs

      BURKE M. WONG, ESQUIRE
        On behalf of the Defendant

Reported by:

John McCarthy

16

1          Q    So the two people working with you were Jack Ryan,

2     the DEA agent?

3          A    That is right.

4          Q    And Kevin O'Connell, the FBI agent?

5          A    That is right.

6          Q    I will assume that you have familiarized

7     yourself with Mr. Grandison's record.

8          A    I have a record of his criminal record.  In fact,

9     he was indited, I believe, in the third count with being in

10    possession of a weapon.  That was the subject -- one of the

11    subjects of the prosecution.  So I was familiar with that

12    portion of it.

13         Q    So you had to be familiar with the fact that he

14    had an extensive criminal record; is that correct?

15         A    Yes.  I have reviewed his rap sheet.

16         Q    Let me ask you this about Mr. Grandison:  From the

17    government's point of view, was he considered a high level

18    narcotic dealer?

19         A    Are you talking about the government's point of

20    view, or are you talking about my point of view.
                                  is,
21         Q    My question/from the government's point of view?

20

I had assisted in some aspects of that case.  But
the connection between Peanut King, if there is any, and
Anthoney Grandison, was never made by me.

Q    You don't know of any such connection?

A    I don't of any even now.

Q    So from your point of view this was a substantial
case, but it was not as big a narcotic dealer that would be
tried in the Baltimore area?

A    I think that would be accurate.

Q    That was your opinion of the case?

A    Yes.

Q    Now, were you familiar with the fact or did you
familiarize yourself with his convictions for assaulting a
federal officer?

A    Other than the fact that he had been convicted.
That is all I knew about it.

Q    You didn't review the file or know any more about
it?

A    No, I didn't.

Q    You didn't discuss it with the agents that you
were working with on the case; is that correct?

21

1    A    No, I didn't.

2    Q    How about the prior charges that were brought

3  against him for assaulting a federal witness. Were you

4  familiar with that?

5    A    I was not familiar with that at that time.

6    Q    You didn't become familiar with it until when,

7  after April 28th of '83?

8    A    That is right.

9    Q    The drug enforcement agent that worked with you

10 didn't advise you of that?

11   A    No, he didn't.

12   Q    Agent Ryan, I believe had previously been involved

13 with an arrest of Mr. Grandison while Ryan was still with

14 the Baltimore City Police Department.

15   A    I don't know anything about that.

16   Q    Ryan didn't say anything to you about that?

17   A    No.  I was familiar with the fact that Ryan knew

18 him, because Ryan was important in identifying the

19 photograph of the person who went through the machine at the

20 BWI Airport, and had a large amount of cash.

21        The police officer who was part of that stop took

22

1   a poloroid of him.  And I knew that Ryan had identified the

2   photograph.  So I would assume that he was familiar with the

3   case of Anthoney Grandison.

4           The reason why he was familiar, or how he gained

5   familiarity with him, I didn't know at that time.

6       Q    He never told you about this prior case?

7       A    No.

8       Q    Is it fair to say, that at least at the point in

9   time when, let us say March of 1983, you were satisfied in

10  your mind that based upon Grandison's record and the amount

11  of drugs involved that he was a dangerous person?

12      A    No, I wasn't.

13      Q    You didn't think he was dangerous even based on

14  his own criminal record?

15      A    I think every drug dealer is dangerous.  It is the

16  nature of the business.  It is not unusual for drug dealers

17  to be armed.

18          It is mainly because they carry large amounts of

19  currency.  They have people who are in positions where they

20  might do violence to them to get their money away from them,

21  or get their drugs away from them.

23

1       I think you have to classify any one involved in

2   drug trafficking as being potentially dangerous.

3       Q    And violent?

4       A    Not necessarily violent.  Not necessarily violent,

5   but potentially dangerous.  I didn't see him or have

6   potential for violence because they are dangerous.  If there

7   is a situation where they felt as though their drugs might

8   be stolen, I am sure they might resort to that.

9       Q    You had looked at the FBI rap sheet.  Is that what

10  you had?  This is what your attorney produced Monday.

11      A    This is what I had.

12      Q    You didn't get anymore of a detailed explanation

13  on any of these facts, or any of the underlining charges; is

14  that correct?

15      A    No.  And one of the things that you should be

16  aware of is that many of these things are repetitious.  Some

17  of these charges are repetitious.  Not every one of these

18   entries is, in fact, a separate charge.  Many of them are

19  repetitious.

20      Q    His use of fire arms and assault on federal

21  witnesses and assault on federal officers, you didn't think

26

Q    You don't remember the exact language?

A    I wasn't there.

Q    The language as it was reported to you?

A    I think I have said it as best that I can recall it, "you better think about it," or words to that effect, "before you go in there and testify."

Q    Did you consider it a serious threat at that time?

A    I considered it serious.  But I didn't consider it a threat.  I considered it seriously enough to approach Judge Howard and explain to him what had happened, and asked him to do something about it.

Q    When you approached Judge Howard, who was present when you approached Judge Howard?  Was this a bench conference or something?

A    It was an open court.  There was a defense attorney --

Q    For Grandison?

A    For Grandison.  Ed Smith, Grandison, Judge Howard, myself and the court reporter were present.

MR. WONG:  May I interrupt.  I have the transcript of the particular conversation that we are getting to here.

27

1    I don't mind if you mark it as a deposition exhibit.

2        Q    If that is what it is.  There were no other

3    conferences, although there is a reference here of off the

4    record.

5        A    That is off the record.

6        Q    There is reference here to something being off the

7    record?  In just glancing through it I see that.  Is there

8    anything else on here?  Have you reviewed this?

9        A    Yes.

10       Q    There was no other conferences between you and

11   Judge Howard, with reference to this case, referencing  this

12   threat?

13       A    No.

14       Q    In other words, what ever is on these pages here

15   is it; is that correct?

16       A    That is correct.

17       Q    Then Judge Howard admonished the witness?

18       A    Yes.  And that is in the record, as well.

19       Q    Not admonished the witness.  Did he admonish Ms.

20   Moore?

21       A    He directed/it at Ms. Moore, who was really the only

29

1          Janet Moore, to me, was a girlfriend.  It is not

2    unusual, in my experience, in having people like this offer

3    vague threats to witnesses.

4          I was concerned, but I was not overly concerned.

5    I certainly did not see this as causing any concern to her

6    physical, or her physical danger.

7          Q    The fact that whatever Janet Moore did, whatever

8    she said that heightened your sensitivity to some potential

9    problems?

10         A    To the point where I was concerned enough to go to

11   Judge Howard, advised the court and have the court advise

12   her that she should not do what she had done, and that she

13   ought to maintain her distance from any other witnesses in

14   the case.

15         Now, I felt as though that had accomplished what

16   would be sufficient to stop her from causing any more

17   problems.

18         Q    Right.  I am just glancing through this.  I am

19   assuming that you did not tell Judge Howard about

20   Grandison's record, and specifically you didn't tell him

21   that he had previously been involved with what was alleged

30

1   to have been some type of contract murder in a federal case

2   some few years earlier?

3       A    I didn't know about that.

4       Q    You didn't tell the judge about that?

5       A    I couldn't have, because I didn't even know

6   anything about it.

7       Q    You knew there was a conviction?

8       A    Yes.

9       Q    On that case?

10      A    The judge was aware of that because it was in the

11  inditement, or should have been.

12      Q    There was a conviction.  There was a conviction on

13  the federal officer assault.

14      A    Yes.  That was the basis of the felony possession

15  charge at the time.

16      Q    And the inditement  spelt  that out.

17      A    Yes.

18      Q    When you approached him about this you didn't

19  mention the other things where a witness had been shot,

20  allegedly involved with Vernon Evans?

21      A    I didn't know of that.

40

1              I might have said that.  But I don't recall saying

2     to her, "don't worry about it."  I didn't -- my personal

3     feeling was, I didn't think it was really something to be

4     concerned with beyond someone who was approaching witnesses,

5     and making comments that might have been caused by the

6     emotions of the fact that someone who was close to them was

7     being charged with a crime.

8         Q     But you didn't tell her not to worry about it; is

9     that what you are saying?

10        A     I can't remember saying that.  I don't recall

11    that.  I don't recall saying to her, "don't worry."

12        Q     But you did attempt to at least calm her?

13        A     Yes, I certainly did that.  I certainly did that.

14        Q     You didn't tell her anything about his past record

15    or his record or anything like that?

16        A     I would never tell a witness anything like that.

17        Q     With regard to her testimony in the case, is it

18    fair to say that between Cheryl and Scott, at least the way

19    the situation stood prior to April 28, 1983, that their

20    testimony was critical in terms of convicting Mr. Grandison;

21    is that correct?

41

1      A    It was certainly important.  It was certainly

2   important, yes.  Yes, I would think that certainly Cheryl's

3   testimony would have been critical.

4      Q    Without her testimony you probably couldn't have

5   gotten past the suppression hearing.  In any event, you

6   probably would not have been able to get a conviction in

7   this case; is that correct?

8      A    Well, it certainly was an issue that had to be

9   covered under the suppression hearing.  The law at that

10  time, and it is still now the same, once that testimony was

11  developed the testimony was admissable.  Especially since

12  there was confrontation and cross-examination by both of

13  them.

14     Q    You mean, you are talking about using the motions

15  testimony about the case and the case in chief, the main

16  case?

17     A    Yes.

18     Q    The main case?

19     A    Yes.

20     Q    But is was critical, so to speak?

21     A    Yes.

42

Q    Was there any further investigation, or did you
request anybody to do any further investigation in to Janet
Moore, like getting the background information on her, or to
see if there was anything else on her, or anything like
that?

A    No.  But there were things that  were developed
during the investigation, even before the shooting, that
related to her.  Although, she was not identified as the
person that they related it to.

The case, factually became very important to
establish the existance of Grandison's attendance at the
Sugar Ray Leonard Retirement, which occurred at the Civic
Center in Baltimore.

Now, that was tied in generally to the rooms where
the drugs and the guns were found.  The testimony of Scott
was, well, he wasn't able to identify Grandison's face, but
he knew that he belonged to the room where the drugs and the
guns were found, and he told Cheryl that.  Cheryl was able
to identify him on the night that he came back from the
Retirement Benefit and had on his person a card that showed
that he had been at the Retirement Benefit.

43

1          We went to the Baltimore Civic Center and found

2     out that two tickets, at least two tickets, were purchased

3     in the name of Wendy Grandison.  That was something that was

4     established by the -- in the investigation prior to the

5     shooting.

6          Since then, Wendy Grandison, it is clear that

7     Wendy Grandison was Janet Moore, but at that point there was

8     no indication that Wendy Grandison was Janet Moore.

9          The name, "Wendy Grandison", was also used in the

10    jail's visitors list when she visited Grandison.  There was

11    a connection of the name of Grandison while he was at the

12    jail.

13    Q     You never uncovered any criminal record on Janet

14    Moore?

15    A     No.  It was not an issue in the case.

16    Q     Have you since found out whether she had one?

17    A     I don't know.

18    Q     As far as Janet Moore, the incident on March the

19    14th, you didn't deem it necessary to take any investigative

20    action?

21    A     Not at that point.

44

1     Q    Specifically, investigate Janet Moore and her

2  relationship to Grandison?

3     A    As I said, I didn't think it was all that unusual.

4     Q    The conversation was not all that unusual?

5     A    Right.

6     Q    Do you recall any other instances, or any other

7  discussions with Cheryl or Scott involving you and/or Ryan

8  or O'Connell or anyone else, where in they expressed their

9  concern about their safety, or even about why they should be

10  testifying in the case?

11     A    One of the things that should be clear is that

12  Jack Ryan was involved in the investigation early on.

13          He was working as a Drug Enforcement

14  Administration Agent at the Baltimore FBI office, in

15  November of 1982.  He continued in that role for a while.

16          Kevin O'Connell assumed the role of Case Agent,

17  and was the Case Agent throughout my involvement, my

18  exclusive involvement with the case.

19          The first time we went out to speak with Cheryl

20  and Scott was probably in the month of January.  At that

21  meeting, which took place at the Warren House, I think both

67

1  telling them what the dangers are in testifying,

2  particularly in a drug case like this, with a violent

3  person?

4        A    I didn't perceive them as being in danger in this

5  case, number 1.  I think I have explained that to you in my

6  answer.

7        I saw these people as fact witnesses.  Although,

8  their testimony was important, it was not the kind of

9  testimony that would generally generate the kind of action

10 here, assassination.

11       It is very unusual, extremely unusual.  I can't

12 remember in my federal experience that fact witnesses have

13 been killed.  Not that it has not happened, but it is a very

14 unusual situation.

15       I think the government has a greater obligation to

16 informants and cooperators, rather than fact witnesses who

17 are citizens, who see crimes occur and are witnesses because

18 of the circumstances.

19       Q    Do you feel that you had a duty, or that the

20 government has a duty, if asked by a witness, what kind of

21 person am I testifying against; does that person have an

68

1   extensive criminal record; does this person have a violent

2   record?

3           Do you feel obligated to tell them the truth?

4       A   I wouldn't tell them anything about the person's

5   criminal record.

6           I would simply say, that it is not something that

7   you should be concerned with.  That is certainly not going

8   to encourage them to cooperate, if you want them to

9   cooperate, and the type of testimony that they are going to

10  give.

                            them
11          Like telling/that they have a multiple murderer.

12  That is certainly not likely to generate any cooperation on

13  the part of the witness.

14      Q   I understand that.  What you are saying is, they

15  don't have any right to know that?

16      A   I know that they have no right to know.

17      Q   Are you talking about from a legal sense or from a

18  moral sense?

19      A   From either one.  I don't think they have a right

20  to know.

21      Q   Do you know Joseph Howard, Jr.?

72

1    A    As I said, I think that Luther Pugh expressed some

2    concern.  Just general concern about what was going on.

3    Q    Did he ultimately testify?

4    A    I think he did.  I am quite sure he did.

5    I think that the maids at the Warren House Motel

6    might have also expressed general concern about testifying.

7    Q    You told them the same thing as anybody else, I

8    presume?

9    A    I assume so.  I don't have any specific

10   recollection as to what I might have said to them.

11   Q    And Cheryl did testify, of course.

12   A    Yes, she did.

13   Q    So she had testified at the pre-trial hearing, and

14   she testified at the main case that began on or about May

15   3rd of '83?

16   A    Yes.

17   Q    She has also testified in the federal civil rights

18   case.

19   A    Correct.

20   Q    And she has also testified in Somerset County in

21   the state murder case; is that correct?

73

1      A      Yes.

2      Q      Against Grandison?

3      A      Yes.

4      Q      And she also testified, I believe it was in

5  Worcester County?

6      A      Yes.

7      Q      In all of those cases, are you aware that she has

8  testified in all of them; is that correct, to the best of

9  your knowledge?

10     A      I was present at various times when she was

11  waiting to testify.

12     Q      As far as you know she has told the truth in those

13  hearings and trials?

14     A      I would assume so.

15     Q      Has she ever not been candid or truthful with you?

16     A      Not that I know of.

17     Q      Or anybody with the government, has she always

18  been candid and truthful?

19     A      I am not aware of her not being truthful.

20     Q      Maybe I misheard you.  Did you indicate that if

21  she had any problems that she could call the police?

105

STATE OF MARYLAND,

         SS:

     I, John McCarthy, do hereby certify that the within named, <u>JAMES C. SAVAGE</u>, personally appeared before me at the time and place herein set out, and was interrogated by counsel.

     I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

     I further certify that the stipulation contained herein was entered into by counsel in my presence.

     I further certify that I am not of counsel to any of the parties, nor an employee of counsel, nor related to any of the parties, nor in any way interested in the outcome of this action.

     As witness my hand this _____ day of April, 1987.

                           _____
                           Court Reporter

Exhibit 6

No. 08-00024 (D.D.C.)(RJL)

Plaintiff's Exhibit (D)
(Letter Of Janice Galli McLeod)
(Associate Director)

**U.S. Department of Justice**

Office of Information and Privacy

_____

*Telephone: (202) 514-3642*                    *Washington, D.C. 20530*

AUG 0 2 2007

Mr. Anthony Grandison
No. 172622
Maryland Correctional Adjustment Center          Re:     Appeal No. 07-1706
401 East Madison Street                                   Request No. 07-1606
Baltimore, MD 21202                                       ALB:CAS

Dear Mr. Grandison:

      You appealed from the action of the Executive Office for United States Attorneys
(EOUSA) on your request for access to certain records pertaining to a civil case entitled
<u>Piechowicz v. United States</u>, No. K-86-802 (D.Md).

      After carefully considering your appeal, and as a result of discussions between EOUSA
personnel and a member of my staff, I am remanding your request for a further search for
responsive records. If EOUSA locates responsive records through this search, it will send any
and all releasable portions of them to you directly, subject to any applicable fees. You may
appeal any future adverse determination made by EOUSA.

      If you consider my action to be a denial of your appeal, you may seek judicial review in
accordance with 5 U.S.C. § 552(a)(4)(B).

                                         Sincerely,

                                         Janice Galli McLeod
                                         Associate Director

Exhibit 7

No. 08-00024 (D.D.C.)(RJL)

Anthony Grandison #172622
MCAC C-46
401 E. Madison Street
Baltimore, MD. 21202

**Civil Action No. 08-00024 (RJL)**

Ms. Caroline A. Smith (DC Bar #501942)
Attorney-Advisor
U.S. Department of Justice
Office of Information and Privacy
1425 New York Ave., N.W., Suite 11050,
Washington, D.C. 20530-0001

Dear Ms. Smith

      I've taken this opportunity to write your office because I mistakenly attached the wrong Plaintiff Grandison Exhibit (C) to your copy of my Opposition to Defendants Motion for Summary Judgment, and my Cross Motion for Summary Judgment. That Exhibit (C) is missing the following enclosed 14 pages. So please find enclosed those 14 pages which will make Plaintiff Grandison Exhibit (C) (James C. Savage Deposition taken on April 1, 1987). Now you have the very same Exhibit as was forward to the Clerk's Office to be filed in this case.

      Thanking your Office in advance for your time and any consideration in these matters.

      Respectfully, submitted

      Anthony Grandison #172622

Dated: June 20, 2008

cc United States District Court for the District of Columbia

25

1    A    I wasn't even familiar with the fact that he had

2    anything to do with an assault on a federal witness, not at

3    that time.

4    Q    At some point Cheryl Piechowicz advised you of a

5    threat that had been made by a Janet Moore.

6    A    Well, she -- what happened was, that I was told

7    about a conversation that Cheryl Piechowicz had with Janet

8    Moore outside the courtroom.  I believe it was on the second

9    day of testimony, on March the 14th, and he related that

10   information to me, that there was a conversation that it was

11   not --

12   Q    -- who is the "he"?

13   A    Jack Ryan.  And that what it was is, from my

14   recollection of it, it is that Janet Moore approached Cheryl

15   and another witness or witnesses who were out in the hall,

16   and it was just, basically, asking questions of them, and

17   made a statement to Cheryl as she was going in to the

18   courtroom, "she better think about what she was doing."

19        Clearly, something that was probably meant as a

20   threat, but I don't know if I would characterize it as a

21   threat.  It was much more vague than that.

ABRAHAM WEINAPPLE & ASSOCIATES
906 Court Square Building
Baltimore, Maryland  21202

Court Reporters

Phones: 752-0267
        752-0268

1    lady witness that was in the courtroom at that time.

2        Q    There were not a lot of people there?

3        A    There were supervisors there from the drug

4    enforcement, I think.  There might have been someone there

5    from the FBI.  I don't remember.  There was not a large

6    number of people who were there in the room.

7        Q    If that is what was said, we can dispense with

8    that.

9            After that was done, after that comment was made

10   in a report to the Judge, did you consider the situation to

11   be any more dangerous than it was prior to that report of

12   the threat to you, in so far as Anthoney Grandison being a

13   threat to any one?

14       A    You have to understand, Anthoney Grandison was in

15   jail.  He was in custody.  I didn't see him as being a

16   person, with the information that I had, of having any

17   organization to speak of.

18           He had some people, possibly that worked for him

19   that came out in the investigation, but they seemed like

20   they were -- it was not really an organized organization as

21   such.

ABRAHAM WEINAPPLE & ASSOCIATES
906 Court Square Building
Baltimore, Maryland  21202

Court Reporters

Phones: 752-0267
752-0268

31

Q    So, essentially, you reported the incident. You didn't indicate that this man was an exceptionally dangerous individual because you have said that you didn't consider him to be exceptionally dangerous to begin with?

A    That is right.

Q    There came a point on March 14th, where I understand that you had a conversation with Cheryl Piechowicz, Scott Piechowicz, Jack Ryan, in your office after this incident. This is before you went to see Judge Howard.

A    I don't recall that, particularly. I know there was some sort of conversation. I couldn't say that it occurred before I approached the bench of Judge Howard, or whether it was after.

I don't have a real fix of that on my mind. But I know there was some conversation. It was not only with Cheryl and Scott, there were also other witnesses out there that expressed, at least a little concern about that woman talking to them.

Q    Had she talked in a threatening manner to anybody else?

ABRAHAM  WEINAPPLE  &  ASSOCIATES
906 Court Square Building
Baltimore, Maryland  21202
Court  Reporters
Phones: 752-0267
752-0268

32

A     I didn't hear that.  But I know that there was some -- my recollection is that Luther Pugh, in particular, was nervous about being there.  But beyond that, I can't say.

Q     Was it reported to you that she had said something to other witnesses?

A     She was talking out there.  Basically, my understanding was that she was out there and was speaking, generally, to the people who were around the courtroom waiting area.

Q     Who gave you this information?

A     Jack Ryan.

Q     So he had overheard some of these conversations?

A     I don't know whether he did or not.

Q     Did there come another point where you had a conversation with Cheryl and Scott and/or Jack Ryan about this incident?

A     Yes.

Q     Do you recall if that was in your office or not?

A     I don't have a recollection of whether it was in the office, or whether it was out in the hallway or outside

ABRAHAM WEINAPPLE & ASSOCIATES
906 Court Square Building
Baltimore, Maryland   21202

Court Reporters

Phones: 752-0267
752-0268

)

1    the courtroom after the hearing that day.  I just don't have

2    a recollection of it.

3         Q    At that point you had already been advised by

4    Agent Ryan of what Cheryl had told him.

5         A    Yes.

6         Q    Is that correct?

7         A    Yes.

8         Q    And then you got together with Cheryl, Scott and

9    Ryan, and there was the four of you some place, whether it

10   was in your office or the hallway, but there was a meeting.

11        A    There was the four of us.

12        Q    What happened at that meeting?  Did you ask Cheryl

13   directly, again, what had happened or to repeat what had

14   happened?

15        A    I don't know whether I did or not.  I might have.

16   I know that there was probably something said by her as to

17   telling me about what happened.

18            I am sure that that occurred.  I don't have any

19   specific recollection, but I would be surprised if I didn't

20   learn that from her directly, as to what was said.

21        Q    And your response to what she said was what?

34

1     A     I indicated to her that, you know, gee, if there

2   was any concern that she had that she could contact Jack

3   Ryan or the police about her concerns.

4          My recollection is that Ryan gave her a card and

5   indicated that she could call him at any time, that the Drug

6   Enforcement Administration had phones available 24 hours,

7   and that they could get in touch with them.

8     Q     Did Ryan say anything to the effect, in your

9   presence, in telling Cheryl, I think it was words, we have

10  been after him for a long time, or we have been trying to

11  get this guy for a long time?  They were words to that

12  effect.

13    A     I don't recall him saying that.

14    Q     Do you recall him saying anything like that?

15    A     I wouldn't even be able to consider that.  No, I

16  didn't say that.

17    Q     You told Cheryl not to worry about it,

18  essentially; is that correct?

19    A     I told her, if there is anything that she saw as a

20  threat that she could get in touch with Agent Ryan, and that

21  he would see if there was a need or a response that was

ABRAHAM  WEINAPPLE  &  ASSOCIATES
906 Court Square Building
Court Reporters                Baltimore, Maryland  21202

Phones: 752-0267
        752-0268

35

required, that the response would be given.

Q    Did you indicate to her that any future concerns that she had should be expressed to Ryan or to you, or to whom?

A    I just don't recall that there was any conversation about it at that time, about any future concerns.

It was left, basically, opened, if there was anything that she perceived as a threat or concern that she should get in touch with Jack Ryan.

Q    So you are saying that you told her to speak to Ryan as opposed to you?

A    Yes.

Q    After that did you have any further conversation with Cheryl about it?

A    I don't know.

Q    That day, I am talking about?

A    That day, no.

Q    How about Scott?

A    Scott, my recollection is that Scott didn't seem to be too concerned about it at all.

36

1          I think that my recollection is, that Cheryl was

2    more concerned than Scott was about it.  Mainly because she

3    had been approached by the woman.

4          Q     Right.  But she was concerned; is that correct?

5          A     Yes, she was.

6          Q     And, then, at that point did you have any further

7    discussion with Jack Ryan about this, out of the presence of

8    Cheryl and Scott?

9          A     No.  I don't recall any conversation with Ryan

10   about it, no.

11         Q     At that point, then, you decided to take the

12   matter to Judge Howard.

13         A     I don't know whether that was the time sequence.

14   But that day, when I had heard about it, I went to the Judge

15   immediately, advised him of what had occurred, Janet Moore

16   was in the courtroom, and he heard from me and he made a

17   statement to her.

18         Q     I don't want to be elaborate, but exactly what did

19   you tell Cheryl about this, as far as her concerns, what she

20   perceived to be a threat?

21         A     Well, I addressed it in the way that I saw it, and

1    right to be out there speaking to her, and also had a right
2    to be out there speaking to other people.  They didn't have
3    to speak to him.  However, he certainly had a right to be
4    out there asking questions.
5           As far as raising any questions about safety or
6    concern one way or the other, that would be the only
7    conversation that I had with them, and recall with them in
8    which they expressed concern, which I think it was Cheryl.
9           I can't tell you while we were at the Warren House
10   or while it was in the preparation of the interviews at the
11   Warren House, or at the telephone conversation, at the phone
12   call.
13   Q    So certainly modifying what you put in your
14   interrogatories, where you indicated that there was no
15   conversations relative to concern after March 14th, and
16   prior to April 28th --
17   A    -- there was this one incident, then.  I wouldn't
18   characterize it as an expression of concern.
19          It was, does the defense attorney have the right
20   to be out here, and does he have the right in asking these
21   questions?  That is the only thing that comes close.

ABRAHAM WEINAPPLE & ASSOCIATES
906 Court Square Building
Baltimore, Maryland  21202
Court Reporters
Phones: 752-0267
752-0268

)

1      Q    Did Cheryl say that she was concerned?

2           By the way, he was conducting himself and making

3      her nervous?

4      A    I do remember, and I recall now she was saying, he

5      was kind of pushy and, you know, something like that.  But

6      beyond that, I don't really have any recollection.

7      Q    You have read her answers to interrogatories, and

8      have reviewed them, I presume?

9      A    I don't know if I have or not.

10     Q    Have you reviewed her deposition testimony with

11     counsel?

12     A    No, I haven't.

13     Q    You don't recall an answer where she indicated to

14     you that she and Scott sort of looked in the phone book and

15     saw the name "Grandison" and thought that some people named

16     Grandison might be related to him, and they lived fairly

17     close to the Warren House?

18     A    I definitely do not recall a conversation like

19     that.  I do not recall that kind of a conversation.

20     Q    The only time you recall any sort of communication

21     of anything that might be a concern would be this

ABRAHAM  WEINAPPLE & ASSOCIATES
906 Court Square Building
Baltimore, Maryland  21202

Court Reporters

Phones: 752-0267
        752-0268

1  conversation of Ed Smith being there?

2       A     Yes.

3       Q     Would it have made any difference to you if she

4  had expressed this concern about thinking, maybe some of his

5  family members were in the neighborhood or lived close by?

6       A     What concern are you talking about?

7       Q     Would it have made any difference to you in

8  handled this situation, if Cheryl said, look, we looked in

9  the phone book and we see these people named Grandison

10  living nearby, and maybe they are related to this fellow,

11  and we are concerned about it.

12       A     The concern that somebody who might be related to

13  this guy lived in the neighborhood and --

14       Q     -- and lived near the hotel and might take some

15  action against her.

16       A     If it was simply her going to a phone book and

17  looking in the phone book for the name "Grandison" and

18  finding a listing in the phone book in the area of the

19  hotel, that indicated that there was Grandison's that lived

20  near the hotel, no, I wouldn't have done anything about

21  that.

1  change your residence, at least until the beginning of this

2  case?

3      A    I was not aware that she was concerned, and I was

4  not aware that there was any threat.

5           If I was aware that there was substantial concern --

6      Q    -- we are talking about after Cheryl's comment.

7      A    Yes.  If I was aware that there was substantial

8  concern, I wouldn't have said those things.

9           If I was aware that there was a substantial

10 threat, I would have brought her in to protective custody,

11 along with the other witnesses.  I was not aware of any

12 threat.

13     Q    Was that decision, as to whether or not to bring

14 them in to a formal protection, your sole decision in this

15 case?

16     A    The decision would be made, based upon the

17 information that I received from the investigative agents.

18          I received no information from them.  I received

19 no information from any other source, other than what I have

20 told you about.

21     Q    Did you request any further investigations, in

ABRAHAM WEINAPPLE & ASSOCIATES
906 Court Square Building
Baltimore, Maryland  21202

Court Reporters

Phones: 752-0267
752-0268

99

1          MR. WONG:  I just have a few questions.

2          EXAMINATION BY MR. WONG:

3      Q    In the United States Attorney's Manual, Title 9,

4  Page 21, there is what is called Eligibility.  In that it

5  states that a witness may be considered for the Witness

6  Security Program where there is clear evidence that the life

7  of the witness or family is an immediate jeopardy.

8          Did you have any facts in your possession, prior

9  to the murders, that that was the case here?

10     A    No.

11     Q    When a witness may be considered for the Witness

12  Security Program, what does that indicate to you?

13     A    That is an option that is available.  That is

14  totally within the discretion of the government, and the

15  prosecution.

16     Q    On Page 2 of the United States Attorney Manual,

17  Section 9-21.310, there is a section that is called

18  Representations and Promises.

19          In that it states investigative agents and

20  attorneys are not authorized to make representation to

21  witnesses regarding funding, prosecution or other programs

100

and services.

Would that indicate to you that you could not even tell her that, well, you should find a hotel or quit your job, or change your working hours?

A     It even goes beyond that.

MR. GOLDBERG:  I will have an objection on the record.  That is your interpretation of it.

THE WITNESS:  The only discretion that we have as Assistant United States Attorneys is to make application.

The decision to accept the person in to the Witness Protection Program is totally within the discretion of the United States Marshall Service, and the Department of Justice.

Q     Section 9.21.45.

MR. GOLDBERG:  What page are you on?

Q     The last page, page 9.  There is a section, Witness Security Program Policy Board.

Is it not a fact that all of these witnesses relocation matters are matters of the Justice Department and its policy?

A     Absolutely.

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing Defendant Civil Division's Opposition to "Plaintiff's Cross Motion for Summary Judgment" and Reply in Further Support of Defendant's Motion for Summary Judgment, Second Declaration of James M. Kovakas, Defendant Civil Division's Counter-Statement of Material Facts, and exhibits were served upon plaintiff pro se by deposit of a copy thereof in the U.S. mail, postage prepaid, first class mail, addressed to:

> Mr. Anthony Grandison
> DOC ID No. 172622
> Maryland Correctional Adjustment Center
> 401 East Madison Street
> Baltimore, MD  21202

on this 15th day of July 2008.

                                   /s/
                        _____
                        CAROLINE A. SMITH